## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARTHUR W. SLACK, Derivatively On Behalf Of LUMEN TECHNLOGIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> QUINCY L. ALLEN, MARTHA HELENA BEJAR, PETER C. BROWN, KEVIN P. CHILTON, STEVEN T. CLONTZ, T. MICHAEL GLENN, HAL STANLEY JONES, MICHAEL J. ROBERTS, LAURIE SIEGEL, VIRGINIA BOULET, W. BRUCE HANKS, JEFF K. STOREY, INDRANEEL DEV, CHRISTOPHER D. STANSBURY, MAXINE L. MOREAU, SHAUN C. ANDREWS, AND EDWARD MORCHE, <br><br> Defendants, <br><br> -and- <br><br> LUMEN TECHNLOGIES, INC., <br><br> Nominal Defendant. | Case No.: 3:24-cv-01043 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY DEMANDED** |

Plaintiff Arthur W. Slack ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Lumen Technologies, Inc. ("Lumen" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Lumen with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.  Plaintiff believes that substantial evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lumen directors and officers from September 14, 2020 through February 7, 2023 (the "Relevant Period").

2.      Throughout the Relevant Period, the Company's service offerings included providing fiber infrastructure delivering high-bandwidth telecommunication services, primarily under the Quantum Fiber and Lumen brands.  Specifically, Quantum Fiber is the Company's brand for fiber-based services to residential and small business customers, and whereas the Company does business as Lumen when serving enterprise and wholesale markets. In addition to the Company's emerging fiber business, the Company provides mass-marketed legacy copper-based services under the CenturyLink brand.

3.      At the outset of the Relevant Period, the Company announced it would redefine its business by renaming itself from CenturyLink to Lumen and refining its marketing approach, cutting off market segments and operations that did not align with the Company's strategic objectives and adding market segments that were aligned with the Company's vision.

4.      Specifically, the Company announced to investors that it would leverage its existing 400,000 route miles of fiber optic cable, which had previously serviced enterprise and wholesale markets, to expand its fiber services to small and medium business ("SMB") and residential or consumer markets.  The Company represented to investors that expanding its fiber services into the SMB and residential markets, branded as Quantum Fiber, was a natural fit for the Company that represented a strong opportunity for growth.

5.      Throughout the Relevant Period, the officers and directors of the Company represented to investors and the public that the Company was, among other things, "investing heavily in our consumer fiber business" and "aggressively taking market share in our small

business segment." The officers and directors of the Company also represented that "we continue expanding our Quantum Fiber footprint and increasing our penetration" and "we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber."

6.      However, contrary to these statements promoting the rate of investment and progress in expanding fiber services to SMB and residential markets, the Company was experiencing serious headwinds that were impeding its ability to grow its newly-targeted fiber markets. Beginning on February 9, 2022, the officers and directors of the Company caused the Company to begin to admit that its expansion into SMB and residential fiber services was occurring slower than previously represented. On this news, the Company's stock price declined $1.99, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022.

7.      On November 2, 2022, the officers and directors of the Company continued to partially disclose the truth when the Company admitted: "let me be clear, we are not yet at the pace of build we expect or want" with respect to the Company's development of its Quantum Fiber brand. On this news, the Company's stock price dropped $1.25, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

8.      By February 7, 2023, the Company would admit, contrary to what was previously represented, that they had pressed "more of a stop button than a pause button" on its investment into the Quantum Fiber network and expansion into the SMB and residential markets while it re-evaluated its strategic priorities. The price of the Company's common stock had been artificially inflated by these misrepresentations about the Company's progress expanding into SMB and residential markets. Upon the news that the Company's progress was slower than represented and that the Company had stopped investing in the expansion of its

Quantum Fiber network, the price of the Company's common stock dropped as the artificial inflation was removed from the price. On this news, the Company's stock price dropped $1.04, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

9.      On May 11, 2023, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants (defined below) – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as Exhibit A, respectively, is a true and correct copy of the Demand.

10.     On May 26, 2023 and again on June 20, 2023, Plaintiff sent a follow-up email requesting an update on the demand. Attached hereto as Exhibit B is a true and correct copy of counsel for the Board's response.

11.     On July 31, 2023, Plaintiff received a response from the Defendants acknowledging the demand letter and plan to present the letter to the Board at its next regularly scheduled meeting.

12.     On September 5, 2023 and on September 11, 2023, Plaintiff sent a follow-up email requesting an update.

13.     Following this, on September 11, 2023, counsel for the Board responded to inform Plaintiff that the "Board has delegated the matter to its Audit Committee" and that a "further update" is expected "in the next few weeks." The committee members were named to be Defendants Hal S. Jones, Quincy L. Allen, Peter C. Brown, Kevin P. Chilton, and Jim Fowler. Attached hereto as Exhibit C is a true and correct copy of counsel for the Board's response.

14.     Then, on December 20, 2023, counsel for the Board informed Plaintiff that the Board of Directors had appointed a committee to "inquire into the allegations set forth in [the Demand] of May 11, 2023." Attached hereto as Exhibit D is a true and correct copy of counsel

for the Board's response.

15.     On December 21, 2023, Plaintiff's counsel requested the names of the people on the purported "committee" appointed by the Board, and sent a follow-up letter requesting the same on March 13, 2024 and again on April 12, 2024. Attached hereto as Exhibit E is a true and correct copy of Plaintiff's follow-up requests.

16.     However, to date, no further update has been received by the Board or its Audit Committee and no report of the results of the investigation of the "committee" has been forthcoming, thus constituting an unreasonable refusal of the Demand.

17.     The Board's refusal to commence a civil action for an undetermined amount of time, if at all, is an improper and wrongful refusal of the Demand.  Thus, Plaintiff rightfully brings this action in the right and for the benefit of Lumen to recover for the damages caused to the Company by the Individual Defendants. As such, this derivative action should be permitted to proceed.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1).

19.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice. Additionally, in connection with the misconduct alleged herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

21.     Venue is proper in this Court because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

22.     In connection with the acts, transactions, and conduct alleged herein, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

### **Plaintiff**

23.     ***Plaintiff Arthur W. Slack*** ("Plaintiff") is, and was at all relevant times, a stockholder of the Company. Plaintiff will continue to hold Lumen shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### **Nominal Defendant**

24.     Nominal Defendant Lumen is a Louisiana corporation with principal executive offices located at 100 CenturyLink Drive, Monroe, Louisiana 71203. Lumen's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "LUMN."

**Director Defendants**

25.     **Defendant Quincy L. Allen** ("Allen") has been a Company director since February 2021 and is a member of the Audit Committee and the Human Resources and Compensation Committee ("Compensation Committee").

26.     **Defendant Martha Helena Bejar** ("Bejar") been a Company director since 2016 and is the Chair of the Nominating and Corporate Governance Committee ("N&G Committee") and a member of the Compensation Committee.

27.     **Defendant Peter C. Brown** ("Brown") has been a Company director since 2009 and is a member of the Audit Committee and Risk and Security Committee.

28.     **Defendant Kevin P. Chilton** ("Chilton") has been a Company director since 2017 and is the Chair of the Risk and Security Committee and a member of the Audit Committee.

29.     **Defendant Steven T. Clontz** ("Clontz") has been a Company director since 2017 and is a member of the Compensation Committee and N&G Committee.

30.     **Defendant T. Michael Glenn** ("Glenn") has been a Company director since 2017 and is a member of the Compensation Committee.

31.     **Defendant Hal Stanley Jones** ("Jones") has been a Company director since 2020 and is the Chair of the Audit Committee and a member of the Risk and Security Committee.

32.     **Defendant Laurie Siegel** ("Siegel") has been a Company director since 2009 and is the Chair of the Compensation Committee and a member of the N&G Committee.

33.     **Defendant Michael J. Roberts** ("Roberts") was a Company director since 2011 through to 2023 and was a member of the Compensation Committee and N&G Committee.

34.     **Defendant Virginia Boulet** ("Boulet") served as a Company director from 1995 through to 2021.

35.     **Defendant *W. Bruce Hanks*** ("Hanks") served as a Company director from 1992 through to his retirement in 2023.

36.     The above-named defendants at ¶¶ 21–31 are collectively referred to herein as the "Director Defendants."

**<u>Officer Defendants</u>**

37.     **Defendant *Jeff K. Storey*** ("Storey") was the President and Chief Executive Officer ("CEO") of the Company from the beginning of the Relevant Period through his departure on November 7, 2022. As a result of the wrongdoing alleged herein, Defendant Storey is named as a defendant in the Securities Class Action (defined herein).

38.     **Defendant *Indraneel Dev*** ("Dev") was the Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of the Company from the beginning of the Relevant Period through his termination on April 4, 2022. As a result of the wrongdoing alleged herein, Defendant Dev is named as a defendant in the Securities Class Action (defined herein).

39.     **Defendant *Christpher D. Stansbury*** ("Stansbury") served as CFO and EVP of the Company following Defendant Dev's departure, effective April 4, 2022 through the present. As a result of the wrongdoing alleged herein, Defendant Stansbury is named as a defendant in the Securities Class Action (defined herein).

40.     **Defendant *Maxine L. Moreau*** ("Moreau") served as President of Mass Markets at the Company at all relevant times. As a result of the wrongdoing alleged herein, Defendant Moreau is named as a defendant in the Securities Class Action (defined herein).

41.     **Defendant *Shaun C. Andrews*** ("Andrews") served as Chief Marketing Officer ("CMO") and EVP at the Company at all relevant times. As a result of the wrongdoing alleged herein, Defendant Andrews is named as a defendant in the Securities Class Action (defined herein).

42.     **Defendant *Edward Morche*** ("Morche") served as President of Lumen's North

American Enterprise and Public Sector Group at all relevant times.

43.    **Defendant Dugan** ("Dugan") served as Chief Technology Officer at the Company at all relevant times. As a result of the wrongdoing alleged herein, Defendant Dugan is named as a defendant in the Securities Class Action (defined herein).

44.    **Defendant Gibson** ("Gibson") served as Senior Vice President, Sales and Marketing, Consumer Markets at all relevant times. As a result of the wrongdoing alleged herein, Defendant Gibson is named as a defendant in the Securities Class Action (defined herein).

45.    The above-named defendants at ¶¶ 33–40 are collectively referred to herein as the "Officer Defendants."

46.    The Director Defendants along with the Officer Defendants are collectively referred to hereinafter as the "Individual Defendants."

**Confidential Witnesses[1]**

47.    **Confidential Witness No. 1** ("CW-1") was a former Senior Director of Marketing who worked at the Company from 2020 to 2023. Specifically, CW-1 worked in Marketing Intelligence on the consumer side of Lumen's business, which included support of the Quantum Fiber business. CW-1's team did marketing research to support both marketing efforts and strategic decision-making. CW-1 also oversaw a team that engaged in data analytics, which involved predictive modeling to determine which customers were likely to have a propensity to buy fiber on a per-home and per-zip code basis; examining churn; and customer segmentation to determine those "audiences" that were most interested in Quantum Fiber.

48.    **Confidential Witness No. 2** ("CW-2") was a former Director of Experience

---

[1]    All references to Confidential Witnesses ("CWs") are taken from the Securities Class Action (defined herein) and are based upon information and belief.

Management at Lumen from November 2011 through May 2023. CW-2 was part of the Company's Business-to-Business group.

49.     **Confidential Witness No. 3** ("CW-3") was a former Vice President of Marketing & Demand Generation at Lumen from September 2020 to approximately April/May 2022. CW-3 was hired to work on the launch of the Quantum Fiber initiative at Lumen.

50.     **Confidential Witness No. 4** ("CW-4") worked as a Vice President, Global Customer Experience at Lumen from November 2018 to March 2023. CW-4 had been with Lumen and its predecessor companies on and off since 2002. As Vice President of Global Customer Experience, CW-4 looked at and used data, data analytics, and AI to understand the experiences of Lumen's customers so as to drive ways to improve that experience. CW-4 was involved with the Company's calculation of Net Promoter Scores ("NPS").

51.     **Confidential Witness No. 5** ("CW-5") worked as a Senior Manager, Brand & Communications at Lumen from October 2020 to September 2022. CW-5's role included branding and communications work for a Quantum Fiber project, which involved working on "an entire tech stack," which included the billing system. CW-5 was brought onto the project because Lumen's goal for Quantum Fiber was to develop and introduce an entirely new brand.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Lumen and because of their ability to control the business and corporate affairs of Lumen, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lumen in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Lumen and its shareholders.

53.     Each director and officer of the Company owes to Lumen and its shareholders

the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lumen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Lumen, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Lumen.

55.     To discharge their duties, the officers and directors of Lumen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Lumen were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      Remain informed as to how Lumen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

56.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lumen, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

57.      The Individual Defendants breached their duties of loyalty and good faith by

causing the Company to misrepresent the information as detailed *infra*.   The Individual Defendants subjected the Company to the costs of defending, and the potential liability from, the securities class action entitled *In re Lumen Technologies, Inc. Securities Litigation*, Case 3:23-cv-00286 (W.D. Louisiana) ("Securities Class Action").   As a result, Lumen has expended, and will continue to expend, significant sums of money.

58.     The Individual Defendants' actions have irreparably damaged Lumen's corporate image and goodwill.

## THE COMPANY'S CORPORATE GOVERNANCE

59.     As members of The Company's Board, the Director Defendants are required to follow the Company's Code of Ethics, its corporate governance guidelines and the charters of each committee of the Board of Directors.

60.     Accordingly, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing, among other things, the Company's business practices and policies. More pertinently, each of the Individual Defendants were required to be familiar with the Company's internal controls, all applicable rules and regulations, and ensure all disclosures regarding the Company were full, fair, and accurate.

61.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lumen, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## Code of Conduct

62.     At all relevant times, the Company had in place its Code of Conduct which applied to "[a]ll employees, officers and directors of Lumen" and emphasized that the Code of Conduct was in place "to uphold [the] Company's ethical business culture." Accordingly, the

13

Code of Conduct provides the Company's "Operating Principles and Core Beliefs," as follows:

# Our Operating Principles and Core Beliefs

At Lumen, our **Operating Principles, Teamwork, Trust, & Transparency,** represent how we show up and work and Lumen. They are core actions we take to be the best we can be for our team, and for our customers.

## Operating Principles

| TEAMWORK | Understanding, respecting, and collaborating with others toward a common goal. Showing up for each other every day, supporting a no-hero culture, and committing to the team's collective success. |
| --- | --- |
| TRUST | Doing what you say you will do, owning your mistakes, and only sharing information that is yours to share. Being vulnerable, promoting authenticity, and empowering others to fully demonstrate trust. |
| TRANSPARENCY | Telling the whole story by representing information and data accurately, completely, and timely even when difficult. |

Our **Core Beliefs** are what we infuse into everything we do at Lumen – to be the best self for our team and for our customers. They help guide what we do, how we impact and interact with other, and what we consider important. **Those beliefs are Clarity, Courage, Customer Obsession, Growth Mindset, and Allyship.**

| CLARITY | Clear is kind. Communicating in a clear, concise, and thoughtful way. If anything is unclear, including goals, then ask. |
| --- | --- |
| COURAGE | Boldly advocating an idea or opinion especially when it creates a sense of vulnerability. Leaning in and being willing to rumble respectfully for the benefit of the conversation or desired result. Living into your values, asking for help, and supporting others to do the same. |
| CUSTOMER OBSESSION | Listening to our customers from a place of empathy to understand their needs. Taking ownership to determine priorities and advocating for the customer. Responding in a prompt manner to deliver and delight our customers beyond their expectations with a solution. |
| GROWTH MINDSET | Having an open mind and commitment to learning. Seeing challenges, failures, and change as opportunities for growth. |
| ALLYSHIP | Making an active and consistent effort to learn about, support, and advocate for those whose experiences differ from your own. |

Our Operating Principles and Core Beliefs are key pieces of our Lumen Culture and are essential to accomplishing our business goals with a commitment to ethics and in accordance with the principles in the Code.

5



63.     The Code of Conduct, from the outset, makes clear that all "employees, officers and directors of Lumen" are required to:

• Perform our jobs in a manner that is consistent with the Code and our commitment to operating ethically.

• Familiarize ourselves with and follow all applicable laws, regulations, and

14

corporate policies

• Immediately report actual or suspected violations of law, the Code, or other corporate policies

• Seek guidance if we have any questions or concerns

64. In a section entitled "Our Commitment to Ethics with our customers in our marketplace," the Code of Conduct provides, in relevant part, that "Lumen strives to provide high-quality products and services in an efficient manner. However, we must hold fast to our high standards of integrity and ethical business conduct as we pursue our corporate goals." The Code of Conduct further provides:

**Marketing and sales practice**

We must truthfully market, promote, advertise and sell our products. This is consistent with our commitment to act honestly in all business affairs. All descriptions of our products, services, and prices must be truthful and accurate. We must:

• Make only fair, factual comparisons between our products and those of our competitors

• Never misstate facts or confuse or mislead consumers about Company advertisements or promotions

• Follow all applicable sales policies and procedures to ensure we do not engage in unethical or deceptive sales practices

• Never place or record an order for our products and services for a customer without that customer's authorization

65. In a section entitled "Our Commitment to Ethics with our company and shareholders," the Code of Conduct states, in relevant part:

**Accounting and financial reporting**

Each of us has a duty to ensure that all entries in our Company's financial records give an honest picture of the results of our operations and our financial position. We do this by complying not only with our Company's policies, but also with the laws, rules and regulations that govern our financial accounting and reporting. In particular, this means that we must:

• Accurately record all assets, liabilities, revenues and expenses

- Follow all internal control procedures

- Never make false or artificial journal entries

- Never establish unsupported reserves or accruals

Our senior financial officers — including, but not limited to, our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer — have additional responsibilities. They must ensure that the financial information we disclose in public communications and file in the Company periodic reports with the Securities and Exchange Commission ("SEC") is full, fair, accurate, timely and understandable. In addition, senior financial officers are required to:

- Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports inaccurate

- Inform the Disclosure Committee of transactions, events or circumstances that could have a material impact on our Company's financial reports • Fairly and accurately represent material facts or circumstances when interacting with our auditors and those individuals who prepare our Company's financial statements

- Ensure that those who perform accounting or financial reporting functions know and adhere to these principles

All of us, including our senior financial officers, must immediately report accounting or auditing irregularities. In addition, we must report the following:

- Any violation of any law, rule or regulation

- Any incidence of fraud, whether or not material, by any person, including those with accounting or financial reporting responsibilities in connection with financial disclosures or reports

- Any material information, including any deficiency in our internal controls, that could affect or render untrue the information contained in our public communications or periodic reports filed with the SEC or other regulatory body

These matters will be reported to the Audit Committee in accordance with Company policies, procedures, legal requirements and stock exchange listing standards.

**<u>Audit Committee Charter</u>**

66.     At all relevant times, the Company had in place its Audit Committee Charter which set forth certain additional duties and responsibilities for the members of the Audit Committee. Among other things, the Audit Committee Charter provides that: "the primary

function of the Audit Committee is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by (1) overseeing the Company's system of financial reporting, auditing, controls and legal compliance, (2) monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures, (3) monitoring the qualifications, independence and performance of the outside and internal auditors and (4) overseeing the Company's finance functions."

67.    In a section entitled "Powers," the Audit Committee Charter provides, in relevant part:

> The Audit Committee shall have the power to (a) obtain and review any information that the Audit Committee deems necessary to perform its oversight functions and (b) conduct or authorize investigations into any matters within the Audit Committee's scope of responsibilities. Communications between the Audit Committee and legal counsel in the course of obtaining legal advice will be considered privileged communications of the Company. The Committee will have full access to the Company's officers, employees and outside advisors as necessary to perform its duties.
>
> The Audit Committee shall have the power to issue any reports or perform any other duties required by (a) the Company's articles of incorporation or bylaws, (b) applicable law or (c) rules or regulations of the SEC, the New York Stock Exchange, or any other self-regulatory organization having jurisdiction over the affairs of the Audit Committee. The Audit Committee may adopt any policies or procedures required under any such articles, bylaws, laws, rules or regulations, or that it, in its discretion, may determine to be advisable in connection with its oversight functions.
>
> Consistent with applicable law and the Company's organizational documents and corporate governance guidelines, the Audit Committee shall have the power to consider and act upon any other matters concerning the financial affairs of the Company as the Audit Committee, in its discretion, may determine to be advisable in connection with its oversight functions.

68.    Additionally, the Audit Committee Charter provides a checklist of tasks for the Audit Committee to periodically carry out. Among other things, the checklist includes the following tasks:

- discuss with management the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies

- review with management and the outside auditors the Company's financial information including (a) any report, opinion or review rendered on the financial statements by management or the outside auditors (including under AS No. 1301/SAS No. 114 or AS No. 4105/SAS No. 100) and (b) any analysis prepared by management or the outside auditors setting forth significant financial reporting issues and judgement made in connection with the preparation of the financial statements.

- review with management and the outside auditors major issues regarding accounting principles and financial statement presentations, if any, including (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's financial reporting and (c) special audit steps adopted in light of material deficiencies

- receive reports, if any, regarding (a) non-audit services that the Chairman (or any subcommittee) pre-cleared the outside auditor to perform since the last meeting, (b) letters received by the Chairman under the Company's accounting complaint procedures and (c) any other "whistle blower" reports alleging material violations within the purview of the Audit Committee's functions

- recommend to the Board whether the audited financial statements should be included in the Company's 10-K report

- approve the annual proxy statement report of the Audit Committee required by the rules of the SEC

- review the disclosures in each 10-K report regarding management's internal control report required under §404 of the Sarbanes-Oxley Act

- review the audit reports of the outside auditors to be included in the Company's 10-K report

- monitor the effectiveness of the Company's procedures for receiving, retaining, and handling confidential, anonymous complaints regarding accounting, controls, or auditing matters (maintained under SEC Rule 10A-3)

- periodically discuss the Company's policies for identifying, monitoring and managing risk, including periodically soliciting germane reports or information from the Risk and Security Committee (and its subcommittees, if any) or other board committees with risk oversight functions

## SUBSTANTIVE ALLEGATIONS

### The Company's Background

69.     The Company purports to be an international facilities-based technology and communications company focused on providing its business and residential customers with an array of integrated products and services necessary to fully participate in a rapidly evolving digital world.   The Company purports to operate one of the world's most interconnected networks that empowers its customers to rapidly adjust digital programs to meet immediate demands, create efficiencies, accelerate market access, and reduce costs – allowing customers to rapidly evolve their information, communications, and technology programs to address dynamic changes.

70.     Throughout the Relevant Period the Company's service offerings included providing fiber infrastructure delivering high-bandwidth telecommunication services, primarily under the Quantum Fiber and Lumen brands.   Specifically, Quantum Fiber is the Company's brand for fiber-based services to residential and small business customers, and whereas the Company does business as Lumen when serving enterprise and wholesale markets. In addition to the Company's emerging fiber business, the Company provides mass-marketed legacy copper-based services under the CenturyLink brand.

**High Speed Internet Services**

71.     One of Lumen's primary products and services is based upon providing high speed broadband services to residential and small business customers. Broadband (short for "broad bandwidth") is a type of high-speed internet access. Bandwidth refers to the total speed at which data can be delivered to internet-connected devices, like a computer. The higher the bandwidth of an internet service, the faster the connection speed will be.

72.     There are several types of broadband internet connections, including Digital Subscriber Line ("DSL") and fiber, among others. DSL internet uses copper phone lines to transmit internet and TV signals. Cable technology uses a coaxial cable, which uses copper phone lines as well, but with a different outer material that allows the signal to travel further

than DSL.

73.     While the copper phone lines for DSL and cable use electrical pulses for transmission, fiber-optics use light to transmit data along tiny glass strands that are bundled together into a cable, allowing information to travel close to the speed of light. In addition to providing higher speeds, fiber is more likely than copper to provide symmetrical bandwidth to customers, which means that it has equal upload and download speeds.

74.     There are three types of fiber optic cable internet. The fastest and most reliable is "Fiber to the Home" ("FTTH") or "Fiber to the Premises", where the fibers come straight to a building. "Fiber to the Curb" is fiber that gets to the utility pole near one's home and uses coaxial cable to get from there to the home. "Fiber to the Node" or "Neighborhood" is fiber that gets within one mile of a home, but metal wires carry the connection the rest of the way.

**The Telecommunications Landscape Was Changing**

75.     For years, there has been a trend of growing demand for fiber optics' speed and reliability and a reduced demand for DSL. Lumen (then CenturyLink) had been working to expand its fiber network for years, which included expanding CenturyLink's Fiber-to-the-Home broadband services – an important part of the Company's growth that was intended to help offset losses from the Company's lower speed legacy DSL/copper services. As of December 31, 2019, however, it still had nearly twice as much old copper wire planted than the newer, faster and more reliable fiber optic cables. This was true throughout 2020 as well.

76.     As a *Barron's* analyst noted in February 2019, "the majority of CenturyLink's revenues" are made up of "legacy services" which have been "eaten away" by "increasingly affordable wireless plans and new fiber-optic networks[.]" As a result, for several years prior to the beginning of the Relevant Period, the Company's revenues had been steadily declining. According to Lumen's (then known as CenturyLink) 2016 Annual Report, Lumen's 2014 operating revenues were $18.031 billion. These revenues declined to $17.9 billion in 2015 and

$17.47 billion in 2016. The Company knew that revenues would continue to decline without major changes, due to the fact that its business model was in jeopardy from the decreasing need for the many legacy services it offered.

77.     Simultaneously, the Company was facing the consequences of a corporate strategy that for over a decade focused on business-to-business rather than business-to-consumer operations. Securities analysts in September 2020 estimated that "Lumen's enterprise businesses" accounted for "roughly 75% of total revenue, [and] we think revenue is likely to continue declining. Lumen's business customers will continue to benefit from the ability to use shared, rather than private, networks and technological advancements that require less bandwidth and enable more efficient routing."

78.     Additionally, the Company's enterprise business was under pressure at the time because, as at least one analyst observed, although "Lumen has 170k buildings that have fiber and a large number of potential building where fiber can be built, . . . there is limited demand as many potential customers are still out of the office . . . ."

79.     As part of its efforts to "boost its fiber footprint and gain scale," CenturyLink acquired Level 3 Communications, Inc. ("Level 3") in late 2017. A March 4, 2019 article in *Barron's* touted the acquisition as setting CenturyLink "apart from its wireline peers" and "better position[ing] it for growth."

80.     While the Level 3 acquisition helped buoy CenturyLink's fortunes, 2019 was a difficult year for CenturyLink's shares. Indeed, according to a September 27, 2019 article in Barron's, CenturyLink was "one of the worst performing stocks in the S&P 500" in 2019. That year, the Company cut its dividend by more than half, sending shares tumbling 10%. This cut was made to help the Company lower its net debt to earnings before interest, taxes, depreciation and amortization to 2.75 times to 3.25 times, while continuing to pay dividends and invest in growth initiatives.

**The Company Rebrands and Launches Quantum Fiber**

81.　　On September 14, 2020, the Company publicized a major effort to turn things around and compete more effectively against rivals who were far ahead of the Company in the fiber-optics space. Specifically, CenturyLink announced that it was rebranding itself as Lumen and proclaimed that it was ready to enable "Amazing Things" with a "bold new purpose" to help lead enterprises through the challenges and opportunities of the "4th Industrial Revolution."

82.　　Lumen explained that in addition to its "heritage" operations through CenturyLink for residential and small businesses over traditional networks, it was also announcing the new "Quantum Fiber, a fully digital platform for delivering fiber-based products and services to residents and small businesses." According to Lumen, "Quantum Fiber is a subscription-based, prepaid, online platform for delivering premier fiber-based connectivity to residents and small businesses."

83.　　Quantum Fiber's success was largely dependent on Lumen's fiber-to-the-home strategy. That is, for customers to be able to subscribe to Quantum Fiber, their homes or businesses would first need to be fiber-enabled — meaning connectable to, or "passed" with, Lumen's fiber. Thus, the number of homes and businesses passed is an important metric for gauging the successful rollout of Quantum Fiber, as it is the first step to connecting potential Quantum Fiber customers to Lumen's fiber network.

84.　　Analysts estimated that based on information provided by Lumen, including information on Lumen's geographic "footprint," Lumen could enable between approximately 14 – 23 million locations with fiber. Accordingly, the market was very interested in the progress of Lumen's fiber build, including the number of fiber-enabled locations, the number of Quantum Fiber subscribers, and Quantum Fiber's penetration (*i.e.*, the percentage of fiber-enabled homes subscribed to Quantum Fiber). Indeed, analysts asked about the progress of the

Quantum Fiber buildout on nearly every conference call during the Relevant Period.

85.     Unbeknownst to investors, the Quantum Fiber buildout was behind from the start, plagued by inadequate planning, inadequate funding, supply chain and labor issues, as well as other internal issues that made it impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public. Despite being well aware of all this, certain of the Individual Defendants nonetheless falsely and misleadingly reassured the market throughout the Relevant Period that the Quantum Fiber buildout had been carefully planned, that the Company was devoting adequate resources—like materials, labor, and capital—to the Quantum Fiber buildout, and was doing so efficiently to maximize its return on investment.

86.     For example, certain of the Individual Defendants repeatedly stressed that the Quantum Fiber buildout was not "capital constrained," and routinely discussed the capital efficiency of its investment strategy. Indeed, from the very beginning of the Relevant Period, Lumen discussed its "microtargeting" investment strategy for expanding fiber-to-the-home, which meant that it was supposedly "building in selective areas where the return on capital is supportive[.]"

87.     During the August 5, 2020 Q2 2020 Conference Call, Defendant Dev described this strategy as "pick[ing] the neighborhoods where we can get high returns because it's a function of population density or housing density and the cost to build." As Defendant Storey explained, "we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be very efficient in generating a return for the investment that we make."

88.     Certain of the Individual Defendants also repeatedly touted the importance of its fiber-to-the-home investment strategy and its commitment to it, stating, *inter alia*, "we

expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up penetration of our competitive assets[,]" that "we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets[,]" and "Quantum Fiber represents a growth opportunity for us along several fronts." They also stressed to the market that the buildout was not "capital constrained."

89.     The importance of Quantum Fiber continued to increase throughout the Relevant Period, as large divestitures enabled Lumen to invest more attention and capital on its Quantum Fiber expansion. For example, on July 26, 2021, Lumen announced that it would sell its Latin American business to Stonepeak, an alternative investment firm, for $2.7 billion. According to Lumen and Defendant Storey, "[t]his transaction allows Lumen to focus investments in key areas of the business to drive future growth while providing flexibility for our capital allocation strategy."

90.     Then, on August 3, 2021, Lumen announced that it would sell its incumbent local carrier operations ("ILEC") in 20 states to Apollo Global Management, Inc. for $7.5 billion, including debt assumption of approximately $1.4 billion ("Apollo transaction"). ILECs are phone service providers that are mandated by the Telecommunications Act of 1996 to provide and maintain copper services across the nation. According to Lumen, this transaction "will sharpen Lumen's enterprise focus, accelerate the Quantum Fiber deployment, and drive growth on the Lumen Platform."

91.     Lumen would retain its ILEC assets in 16 states, as well as its national fiber routes and competitive local exchange carrier networks. Of Lumen's 2.6 million fiber-enabled units, only 200,000 were included in the divestiture. On the earnings call that same day, Defendant Storey explained that after the closing of the Apollo transaction, "approximately 70% of our remaining mass market footprint" – about 15 million units – "is well suited for

Quantum Fiber investment."

92. Defendant Storey further explained on that call that Lumen would be accelerating its Quantum Fiber push:

> We are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment.

93. Defendant Dev further stated that Lumen would be moving from a micro-targeted approach to a market level approach "to really scale up our investment" for fiber construction. As part of this scale up, Defendant Moreau represented during the August 10, 2021 Cowen Communications Infrastructure Summit that Lumen would "continue to be disciplined in how [it] deploy[s] capital."

94. On November 3, 2021, during the Q3 2021 earnings call, Defendant Storey announced that Lumen planned to "ramp" its fiber-enablement pace from about 400,000 locations per year to over 1 million new locations by the end of 2022, "on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022." At that point in time, Lumen had approximately 2.7 million fiber-enabled locations, 774,000 Quantum Fiber subscribers, and Quantum Fiber penetration of around 29%.

**The Company Promotes its Net Promoter Scores ("NPS")**

95. Certain of the Individual Defendants falsely assured the market that no major obstacles were impeding the progress or cost of Lumen's fiber expansion or the Quantum Fiber rollout, but the market still had concerns about Lumen's business.

96. For example, one analyst noted that "[a]part from geographic areas where it is the only provider option, we don't see any advantage or even reason for consumers to choose Lumen." Additionally, early in the Relevant Period, other analysts noted that Lumen's "~28% fiber penetration among fiber homes passed [means] there is ample room for improvement."

97. The market's concerns persisted throughout the Relevant Period, along with

growing concerns that Lumen's fiber build was not proceeding quickly enough, with one analyst noting that "[w]hile the company says it is not capital constrained, the build pace is clearly subdued despite the frenzy driven by Telco builds, overbuilders, low interest rates (lower hurdle rate), favorable regulatory environment (proposed infrastructure bill calls for $100B for broadband), a high-tide of PE/Infra Fund capital, and lockdown-driven improved business case." Similarly, another analyst noted that "debate is emerging about what the value of fiber assets that don't grow are actually worth." Compared to its peers, there was concern among analysts that Lumen was not growing its fiber investments aggressively enough.

98.     To address these concerns, Defendants falsely claimed that Quantum Fiber had tremendously high "Net Promoter Scores" or "NPS", which is a means of measuring customer satisfaction by asking customers how likely they are to recommend a service to a friend or colleague.

99.     For example, Defendant Storey tied Lumen's claimed high NPS scores to revenue growth and EBITDA during the February 10, 2021 Q4 2020 Company earnings call, explaining that "we grew both adjusted EBITDA and adjusted EBITDA margin in the fourth quarter" and linking that to "improvement in our Net Promoter Scores particularly in those areas where we've invested for growth in fiber-based services for enterprise and consumers," which had the effect of "improving revenue trajectory[.]" Further, Defendant Storey, at the September 22, 2021 Goldman Sachs Communacopia Conference, explained that:

> We've been investing in growth in our consumer and small business customers through Quantum Fiber . . . . Penetration rates, ARPU [Average Revenue Per User], churn, NPS give us confidence across the board with our mass market business. And with around 15 million urban/suburban units in our retained markets, we think there's a lot of opportunity for growth. We continue investing in EBITDA and revenue growth through our ongoing transformation.

100.     Additionally, at the December 7, 2021 UBS Global TMT Conference, Defendant Andrews stated, in relevant part:

> The other one is the success we're having with the Quantum Fiber launch. So 2

years ago, we didn't have the Quantum Fiber launch. Now Quantum Fiber is out in the market. It's resonating. We're reaching the penetration rates we want. And it's really thrilling customers with crazy high NPS scores. So you kind of take the success that Maxine [Moreau] is seeing with Quantum Fiber and the increased focus as a result of the divestiture, and that's what gets us to the plan to kind of double down and dramatically increase build.

101.    As late as September 15, 2022 at the Goldman Sachs Communacopia + Technology Conference, Defendant Stansbury continued to tout Quantum Fiber's NPS scores.

102.    The market was focused on what certain of the Individual Defendants were saying about NPS throughout the Relevant Period and believed what the Individual Defendants were saying. For example, Wells Fargo, in a June 13, 2022 report, discussed the claims of high NPS scores and explained those scores helped it "remain confident in LUMN's ability to achieve its build and IRR [Internal Rate of Return] targets on the FTTH build . . . ."

**The Company Touts its Financial Planning for the Fiber Buildout**

103.    Certain of the Individual Defendants touted their financial planning, including repeated false statements throughout the Relevant Period that the average cost per build was $1,000 or less.

104.    For example, on the November 3, 2021 Q3 2021 Lumen earnings call, Defendant Dev falsely stated that:

> In terms of the $1,000, we are building at a significantly lower cost today . . . . But what we are confident in is the return profile of that business . . . . So we still – irrespective of the actual cost, we think we have a really big margin of error, if you will, in terms of generating great returns.

105.    Defendant Storey reiterated these same build cost figures at the January 6, 2022 Citi AppsEconomy Conference, explaining, "we think that we have a great cost position in our ability to deliver for less than $1,000 per home passed – or at $1,000 per home passed."

106.    At the March 29, 2022 New Street Research and BCG Fiber to the Future – Global Infrastructure Conference, Defendant Gibson emphasized the conservativeness of Lumen's financial planning by explaining:

So we publicly announced that we believe we can build out these 10 million locations for $1,000 or less. And so – and we built some inflation in the numbers into that because we believe that's a good number. . . . But you're absolutely right, we're going to be prudent about where we invest to make sure that the cost is in place and the penetration targets are in place that we continue to drive a really good return on invested capital and return for shareholders . . . .

**Biased Data and Unsupported Financial Data was Generated and Utilized**

107.    The NPS data that Lumen touted was false and misleading and used to make the Quantum Fiber rollout appear to be much more successful than it actually was. Similarly, certain of the Individual Defendants' claims that the financial planning for the buildout was prudent and "capital efficien[t]," including as to the cost and progress of the buildout, was also false and misleading.

108.    According to CW-2, it was widely known within Lumen that although the Company touted how good Quantum Fiber's "experience scores" were, the public numbers were not reliable and based on "funky math" because the scores were derived from "too small a data set." Moreover, according to CW-2, there was an internal war within Lumen over the NPS numbers because of "inconsistencies" in how they had been derived. CW-2 believed that the faulty calculation of the experience scores had been derived to satisfy Defendant Storey.

109.    CW-1 was the employee that CW-2 said had "went to war" over the calculation of the NPS scores. CW-1 explained that the NPS scores had been "massaged and recalibrated to come up with the most favorable numbers." CW-2 explained that the NPS numbers had come from Defendant Moreau and CW-4, who agreed that Lumen calculated NPS "a bit different" than how they normally were derived. CW-1 specifically described an all-hands marketing meeting where Moreau gave the high NPS numbers that were "laughable" to another colleague of CW-1.

110.    According to CW-1, Lumen had "developed its own methodology for reporting NPS that was not in line with the science" of how NPS should be reported, specifically focusing on the sampling issue discussed by CW-2.  As CW-1 explained, the samples used for NPS

reporting by Lumen were (i) only comprised of interviews with customers who had called Lumen's customer service and (ii) only about specific issues. Customers who called to cancel their service were not included in the NPS pool. Similarly, CW-5 confirmed that the NPS scores were "really smoke and mirrors" because they were derived from "so few customers."

111.    According to CW-1, while the traditional NPS method focused on "relational NPS," which is a holistic survey of customer satisfaction, Lumen used "transactional NPS," which focuses just on particular transactions, specifically only "on-boarding transactions," which were "brand-new customers." These customers were ones who had just started their service with Lumen and therefore were still happy with the Company.

112.    CW-1 also explained that a major issue with the Quantum Fiber rollout was that Lumen was simply unable to accurately report "which homes they had turned on or not." The Company used a marketing database called DataMart, which was supposed to draw data relevant to marketing from the myriad systems Lumen used. Unfortunately, according to CW-1, there was "never an accurate count" of "premises passed," *i.e.*, which customers had "Quantum Fiber turned on." According to CW-1, the numbers produced by DataMart would be different than the numbers that were claimed by field engineers from other sources. The marketing department literally did not know who they should be marketing to because the numbers across Lumen's different data systems did not match, and "no one knew" how many premises had been passed according to CW-1.

113.    CW-1 believed that these data integrity issues had been conveyed to Defendant Moreau. Regardless of the source of the data for premises passed, none of the multiple sources available within Lumen had "accurate numbers" that matched with any other source.

**Former Employees Confirm that the Individual Defendants Hid Issues**

114.    Multiple former employees further confirm that although the Individual Defendants repeatedly publicly touted its investments in and progress of the fiber rollout to the

29

market, these statements were false and misleading because the reality was that Lumen hid from investors the fact that Lumen was experiencing major supply chain issues, labor shortages, and other internal issues that materially increased the risk that it could neither meet its goals nor continue to "heavily invest" in the Quantum Fiber expansion.

115.    According to CW-1, the Quantum Fiber buildout was "behind schedule right out of the gate due to a number of factors." One reason was that there were not enough technicians to install fiber at a customer's premises and not enough field engineers to lay fiber. Another problem was the inability of Lumen's operations department to accurately report "which homes they had turned on or not."

116.    CW-2 confirmed that the Company had a "run rate for the homes" they wanted to install fiber to, but what was missing was technology, time, money and "physics" to accomplish the Company's goals. According to CW-2, Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout because of the COVID pandemic.

117.    CW-5 reported similar issues. At the time CW-5 joined the Quantum Fiber project, "almost nothing" had been done towards setting up a new brand, and as of September 14, 2020, the Quantum Fiber billing system was "not ready to go."

118.    Additionally, according to CW-5, while Lumen's technicians operated from electronic notepads to map out where Lumen laid fiber and had fiber connections available, it did so in a way that did not match how the billing systems and CenturyLink.com website had mapped out fiber locations. As a result, the billing system might indicate that fiber was not available when it actually was.

119.    In 2021, CW-5 learned on calls held by Defendant Gibson and attended by CW-5 and others that 85% of orders from existing (i.e., CenturyLink fiber customers) and new customers who signed up for Quantum Fiber "fell through" and were never installed due to ongoing problems with the billing system "not talking to the technicians." By July/August

2022, the percentage of orders that fell through because Lumen was unable to fulfill them dropped from 85% to 65%.

120.    CW-3 similarly stated that as of the first quarter of 2022 (approximately March/April 2022), upwards of 65% of customer orders for Quantum Fiber had not been filled. In some instances, Lumen apparently was taking so long to fulfill orders that after a while the Company simply opted not to show up at all because the personnel did not have enough time.

121.    Just prior to when CW-5 left the Company, Defendant Moreau told CW-5 that Quantum Fiber is "just a wreck."

## THE FALSE AND MISLEADING STATEMENTS

122.    On September 14, 2020, the Company announced in a press release published on its Investor Relations webpage that it would be rebranding itself as Lumen and stated that it had launched "Quantum Fiber," which it described as "a fully digital platform for delivering fiber-based products and services to residents and small businesses."  The Company further reported that "Quantum Fiber will use the Power of Lumen's extensive fiber network and infrastructure."

123.    In connection with the Company's renaming from CenturyLink to Lumen, the Company's stock ticker symbol on the NYSE changed from CTL to LUMN, effective with the opening of the trading day on September 18, 2020.  Soon after the Company announced the launch of Quantum Fiber in September 2020, the Company began communicating to the investing public that the Company had carefully considered plans to invest in and grow its Quantum Fiber brand.

124.    Shortly after the Company announced the launch of Quantum Fiber, Lumen continued to claim that the Company had carefully considered plans to invest in and grow its Quantum Fiber brand, and was doing so efficiently.

125.    On September 15, 2020, Lumen's then-CEO, Defendant Storey, explained

Defendants' commitment to investing in Quantum Fiber and discussed the Company's approach to microtargeting its fiber deployment at the Goldman Sachs Communacopia Conference, stating:

**<u>Defendant Storey</u>**

And so there's a lot of opportunity that we see, but it's fairly small, still 2.5 million homes passed or so. So it's still fairly small. We're going to continue to invest. One of the things that we've absolutely seen, where we invest, we grow. And we will continue to make sure that, that is true. Invest in those areas where customers want our services, where we can create a superior product to all of our competitors. And our fiber-based solution is superior and go through all the engineering reasons why that our fiber-based solution is superior. So we continue to invest where it makes sense for us to drive expanded opportunity.

**<u>Analyst</u>**

Why not do more than microtarget? You have a reasonably large footprint. Is that just what you're finding right now, there are pockets where it makes sense? What would have to change for you to be a little more broad-based in terms of the fiber deployment?

**<u>Defendant Storey</u>**

Well, we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be very efficient in generating a return for the investment that we make. So it's not a limiting factor. It's a targeting factor.

126.    During an earnings call on November 4, 2020 with investors to discuss the Company's financial and operating results for the third fiscal quarter of 2020, Defendant Storey promoted Quantum Fiber's launch and overstated the Company's relevant growth plan, emphasizing that the growth plan included a leadership team focused on growing the consumer and small business markets:

As you can see on Slide 6, while Lumen is the name of our company and our flagship brand for serving enterprise and wholesale markets, we also launched Quantum Fiber. Quantum Fiber is our brand for serving fiber-based services to small business and consumer customers. And just as with Lumen enterprise customers, we're offering our Quantum customers a simplified, highly digital customer experience with expanded tools for managing the Quantum platform with mass market efficiency.

As we continue deploying Quantum Fiber services to the small business segment, we intend to utilize our more than 170,000 on-net, fiber-fed buildings as a starting point, targeting small businesses in tens of thousands of existing buildings. We know that bandwidth is critical for these customers, and our simple, resilient, all digital Quantum services are well positioned to meet those needs. While Lumen's primary focus is enterprise, we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets.

127.    Defendant Storey also stated that the Company's fiber offering was the "best in market," stating:

This quarter, we added 46,000 gigabit subscribers, surpassing the record we set last quarter. Our results confirm our thesis for the Consumer business. We win customers where we invest in fiber, simplify the experience ad use microtargeting in selecting the areas we serve. We believe our consumer fiber offering is the best in the market, and our customer satisfaction results are showing consumers value dedicated and reliable bandwidth.

As you've heard me say many times, our operational improvements lead to highly satisfied customers, more durable revenue and they allow us to reduce the cost of our operations.

128.    During that same call, Defendant Dev assured analysts that the Company was "investing in the products and services that support the Lumen platform. We also continue to invest in expanding our fiber footprint and our digital customer and employee experience."

129.    Reiterating the Company's commitment to focus on Quantum Fiber, Defendant Storey further stated in response to an analyst question that "***from a going-forward perspective, we think that the products, the capabilities that we're layering on top of the great fiber and network infrastructure that we have in place today really position us to grow revenue, and we'll continue to focus on that***." (Emphasis added).[2]

130.    Notably, Quantum Fiber and its impact on the Company's revenues was of great interest to market analysts. The final question of the investor call was from Frank Louthan, an analyst at Raymond James, who asked, "How big can Quantum get in terms of revenue? What's

---

[2]    Unless otherwise noted, all emphasis herein is added.

sort of the TAM [Total Addressable Market] there?" Defendant Storey responded in a way that misleadingly suggested that Lumen would devote adequate resources to the Quantum Fiber buildout and had a plan for the buildout, explaining "Without getting into specific TAMs, it's a strategy in footprint and out of footprint, where we have the ability to win and where we have the ability to build infrastructure."

131.   During a Company conference presentation by the Company's Chief Technology Officer on December 2, 2020, Andrew Dugan assured investors that "***we have been investing heavily in our consumer fiber business***," "***I think the combination of a great service and a great experience [with respect to Quantum Fiber] will absolutely let us win***," and that ***investing between four main categories of fiber are "all relatively significant investments for us.***"

132.   During a January 6, 2021 Citi Global TMT West Conference with the Company presented by Defendant Morche, President of Lumen's North American Enterprise and Public Sector Group, Defendant Morche promoted the Company's success with and continued investment in Quantum Fiber:

> Portions of our IGAM business are doing the same thing.  And also want to call out our Quantum Fiber business in the consumer organization.  We added 46,000 gig customers last quarter alone.  ***So we're seeing really good pockets of growth. And it's going to happen piece by piece as we continue to drive the business forward and invest more.***  So that's kind of on the operating side.

133.   During the prepared remarks of an earnings call on February 10, 2021 with investors to discuss the Company's financial and operating results for the fourth fiscal quarter of 2020, Defendant Dev promoted Quantum Fiber's growth opportunity:

> In addition to fiber-enabled locations, we are now reporting fiber subs and ARPU. ***Quantum Fiber represents a growth opportunity for us along several fronts. Fiber-enabled homes are less than 15% of our footprint, and we continue to invest with our micro-targeting strategy.  Given that a significant number of enabled units were added in the past couple of years, driving up penetration represents a near-term addressable market opportunity. Moreover, we have deemphasized low-speed offerings over fiber, and our typical new sales ARPU now is generally higher than our base, representing***

*another potential opportunity to improve the business.*   Finally, we are breaking out SBG broadband, which until now hasn't been a large focus for us, and we expect to improve the trajectory like we have for consumer broadband.

134.   At that same earnings call, Defendant Storey reiterated the Company's confidence in Quantum Fiber in response to an analyst's question, reporting:

> *And I'll just add, from a market perspective, we're super excited about our Quantum Fiber brand and the capabilities that we bring to the market.   The digital experience is, in my opinion, second to none where our NPS scores reflect a very high satisfaction, the quality of the product, the bidirectional nature of the product and the symmetry of that capacity, the peering networks that we tie that into.   We're extremely excited about the capabilities that we give to the customers and their acceptance of it.*

135.   In addition to making statements about Quantum Fiber's NPS score during the February 10, 2021 earnings call, Defendant Storey also discussed Lumen's strategy for its fiber-to-the-home expansion, stating that it views every opportunity for fiber construction through the lens of using "our capital efficiently":

> So it's a little bit of all of the above. *All of the above has one characteristic and that is -- maybe 2 characteristics, that we think we can drive revenue growth at a low cost of capital and a low OpEx to do it. And so we view every opportunity through that lens: how do we make sure that we use our capital efficiency – efficiently and how do we make sure that we get the penetration that we want.* Neel touched on that as an opportunity for us. We still have an opportunity to improve our penetration in our fiber markets. But it is a little bit of all of the above: new construction, overbuilds in existing areas and then some expansion outside our traditional footprint.

136.   On February 25, 2021, the Company filed its Annual Report for the year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Storey, Glenn, Hanks, Dev, Bejar, Boulet, Brown, Chilton, Clontz, Jones, Roberts, and Siegel. The 2020 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Storey and Dev.

137.   The 2020 10-K began by stating:

> As part of the recent Lumen rebranding, we refined our marketing approach to better align with our customer base. Lumen is the name of our company and our flagship brand for serving the enterprise and wholesale markets. We also launched our Quantum Fiber brand and reconfirmed the importance of our

expansive CenturyLink platform name. Quantum Fiber is our brand for providing fiber-based services to small business and residential customers. Our CenturyLink brand covers our mass-marketed legacy copper-based services, managed for optimal cost and efficiency.

138.    Then, the 2020 10-K stated that Lumen's "strategy remains driven by our fundamental objectives of […] Stakeholder Success and Value Creation – understanding the value and perspective each stakeholder contributes to our overall success."

139.    During an Analyst/Investor Day presentation on April 7, 2021, the Company's President of Consumer Markets Division, Defendant Moreau, during prepared remarks, assured investors of Quantum Fiber's success to date and the Company's committed ongoing investment:

> Hi. I'm Maxine Moreau, President of Mass Markets at Lumen.  As Jeff mentioned, I'm here today to explain the excitement around Quantum Fiber Mass Markets platform for future growth.  ***This new digital platform is rapidly improving many aspects of our business and is foundational for growing fiber customers, increasing ARPU, improving customer experience and reducing churn***.
>
> The past year accelerated an ongoing trend.  More people are working from anywhere, learning from home, streaming video and using data-intensive applications like online gaming and virtual reality.  We have seen a shift in how we consume video and leverage IoT technology for smarter and safer homes. Consumers and small businesses require safe, reliable, high-bandwidth broadband and with fast download and upload speeds.
>
> ***Quantum Fiber can deliver that now and into the future as these trends continue.*** Quantum Fiber is uniquely positioned to fulfill that demand by delivering fiber based broadband services to our consumer and small business customers in a unique and distinct way, one that gives customers freedom, control, confidence and security they need to power their personal and professional lives.
>
> With cable's asymmetrical speed, upload speeds are often far slower than their download speeds, impacting the quality of file uploading, video conferencing, online gaming and other data-intensive applications. Quantum Fiber broadband can deliver symmetrical speeds, creating a compelling value proposition for a large and growing part of the market, leveraging Lumen's highly secure, reliable and vast fiber network coupled with our fully digital-enabled customer experience.

36

We can differentiate Quantum Fiber against our competitors and the industry, and our customers are starting to tell us that.  Quantum Fiber is a reinvented digital approach for customers, a simplified digital experience with a transformed customer success and support model.

We review the entire customer life cycle to eliminate pain points and friction, increase the ease of use and simplify the process from first touch to support. A Quantum Fiber customer's bill looks as simple as your monthly Apple subscription notice, 100% prepaid subscription-based pricing with flexible payment options, including Apple Pay and PayPal with more to come. Since we began launching Quantum Fiber, we have eliminated over 50% of human interactions with our new digital platform.

It's not enough to have an amazing platform, we must also deliver results.  *In 2020, we expanded our fiber footprint by 400,000 locations.  We've committed to future footprint expansion using our micro-targeted urban densification focus and disciplined approach that benefits multiple Lumen business units and customer segments. With urban densification, we can take advantage of many efficiencies in fiber enablement from planning to market readiness and achieve higher sales through targeted digital and local marketing tactics*.

*In one of our top Tier 1 markets, we are already 40% fiber-enabled and plan to continue our expansion in dense urban clusters.  We are also leveraging Lumen's on-net buildings to grow our small business market share and connect MDUs and MTUs that are near net to our national fiber footprint*. 100% of our sales are through online ordering, delivering an amazing customer experience, reducing order cancellation rates before install and lowering operating expenses associated with poor traditional service ordering.

*Fiber is delivering a 20% reduction in run rate-level churn over historical levels, improving revenue and margin trends*.  Quantum Fiber eliminates complexity and enhances the support model for our customers.  Our customers are loving the simplicity, ease of use and service that it provides.  As a result, we are seeing significant improvement in the customer experience measured by Net Promoter Score. Our 2021 year-to-date aggregate NPS scores for Quantum Fiber customers is at positive 76, higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent.

We are also seeing a 50% reduction in churn before install from our enhanced communications and delivery processes.  With an all-digital platform, superior fiber broadband service and the early successes we are seeing, what should you expect from Quantum Fiber in the future?  *Future investments will continue to focus on driving urban densification using our micro-targeted approach. With over 23 million living units and small businesses in our footprint, we have a vast footprint to select from to grow our fiber enablement.  We have the ability to operate outside our footprint anywhere Lumen's fiber is in proximity to MDU and MTU developments*.

*Next, we are aggressively taking market share in our small business segment, especially with MTUs located in dense markets where we have fiber-lit buildings.*

*In the first quarter, we are seeing a fourfold year-over-year improvement in small business fiber broadband net adds.  With approximately 2.4 million locations fiber-enabled and 28% fiber penetration rate at year-end, we have a significant future growth opportunity with the investments we have already made.  We expect to complete the launch of Quantum Fiber across all markets during 2021.*

With that comes our enhanced go-to-market, including local market accountability to drive growth at the neighborhood or building level, micro-targeted sales and marketing efforts and a differentiated world-class customer experience.  As we grow fiber penetration, we have a path to continue growing customer ARPU. We are bringing to market products and services such as fully managed WiFi and other advanced services that enable growth in wallet share, pull-through additional fiber sales and enhance the overall experience.

*Finally, we plan to deliver sustained growth with Quantum Fiber well into the future by growing our market share, footprint, revenue and customer ARPU.*

Thank you for your time.

140.    During that same investor day presentation, Defendant Storey reiterated in prepared remarks similar assurances to analysts:

The bottom line is we are investing in a unique platform of capabilities and solutions.  *We are attracting new customers and growing our base. The industry is recognizing this, and our shift to delivering application technology is only going to accelerate. On the mass market side of our business, we're excited about Quantum Fiber and our fiber-based services to consumers and small businesses.*

*We believe our fiber-to-the-premises technology is superior to any wireless or HFC-based offerings of our competitors now or in the future.*

The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. *As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration.*  Our blended penetration of new and previous builds is almost 30%. *To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher.*

141.    Also, during that same investor day presentation, Defendant Storey and Defendant Moreau answered an analyst's questions concerning the penetration of Quantum

Fiber as follows:

**Analyst**:

Great. My question is on Quantum Fiber. Maxine, I wonder if you could talk a little bit about the right penetration. Do you think you can split the market 50-50 with the cable provider or the other providers? And what are you seeing in some of your best markets? And how long do you think it gets there?

[…]

**Defendant Storey**:

Sorry, thought I had already done that. Before handing it off to Maxine or Neel, let me talk about our fiber-to-the-home strategy and what we're going to do. Maxine touched on the fact that we want to have an urban densification in our fiber-to-the home.

We think it's a great opportunity.  ***And we continue to invest in that. And we've proven over the last couple of years that where we invest, we can grow, where we invest, we can drive penetration.***

***And so I'll continue to focus Maxine and her team as she is on how do we increase the penetration in the markets where we are, but then also how do we continue to use our micro-targeting efforts to expand our footprint. We think there's tremendous opportunity for us.***  But we also don't view it just as a fiber solution. If you listened to Maxine, it's the overall digital experience of Quantum Fiber that we bring to our customers, the way they buy our services, the way they consume our services, the way we deliver them, the way we secure them and make them robust for our customers.

***And so we'll continue to heavily invest in that. We think that we're investing at approximately the right pace. We'll probably pick up speed as we move forward.***

But we've been making sure that we deliver on the value proposition, we get the return on investments and that we're able to drive the penetration. ***And what Maxine and her team have done have proven all of that strategy to us***. So with that, I'll hand it over to Maxine if you want to make any more comments.


**Defendant Moreau**:

Thank you, Jeff, and thanks for the question, Simon. I would say we don't have a ceiling target. We believe that our fiber product is superior to any wireless solution, wired fiber. Our fiber-first strategy is our focus and will continue to be our focus. And Neel has been very clear. ***We don't -- we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand*** our ***footprint, and we believe we've got a long runway for growth in – within Lumen in Quantum Fiber.***

142.    Further, Defendant Moreau echoed Defendant Storey's sentiments regarding

expansion, and declared that the Quantum Fiber buildout was "not capital-constrained[,]" stating:

> *We don't -- we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber.*

143.   Also on April 7, 2021, Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Boulet caused the Company to file its 2021 Proxy Statement with the SEC which solicited shareholders to, *inter alia*, (i) elect Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Storey to the Board; and (ii) approve, on an advisory basis, executive compensation.

144.   From the outset, in a letter penned by Defendant Storey to shareholders, the 2021 Proxy Statement provided:

> With the launch of Lumen, we have also enhanced our go-to-market approach for our small business and residential customers. While Lumen is the name of our company and our flagship brand for serving the enterprise and wholesale markets, we also launched Quantum Fiber. We are investing in Quantum Fiber to deliver fiber-based services to small business and consumer customers, delivered through our simplified, highly digital customer experience.

145.   The 2021 Proxy Statement continued to tout the launch of Quantum Fiber as a key "business highlight" and an achievement under Defendant Storey's leadership. Accordingly, based upon the false and misleading statements contained therein, shareholders voted in favor of the election of Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Storey to the Board and executive compensation.

146.   In response to an analyst question regarding Lumen's Quantum Fiber client footprint on a May 5, 2021 earnings call, Defendant Dev again touted the Company's Quantum Fiber strategy and the growth opportunity:

> In terms of your question on Quantum Fiber, what we see is our micro-targeting approach is working. And from an aggregate level, I know we're 28% penetration. And that's because as we are driving up our penetration, we're also adding more units. But if we look at certain neighborhoods, certain markets

where we've been there for a while and we track the penetration by aging of those deployments, in some markets, we're up in the 40%, 50% ZIP code. So we clearly think there's a fair amount of opportunity to continue to drive the penetration up. So we'll continue with our focus on adding more Fiber to the Home and small business, and driving up those penetration rates.

147.     On August 3, 2021, the Company held an earnings call with investors to discuss the Company's financial and operating results for the second fiscal quarter of 2021. During the prepared remarks, Defendant Storey assured investors that the Company expected to accelerate the growth of its Quantum Fiber investment, due to its divestment of the LATAM and Apollo assets, and was working on a build plan to accelerate Quantum Fiber:

*First, we absolutely expect to accelerate the pace of our growth investments in Quantum Fiber*. By retaining the 16 states we have, fiber-based consumer and mass market services remain a huge opportunity for us and we have built a differentiated offering with Quantum Fiber, enabling an all-digital customer experience that uniquely positions us among mass-market broadband providers. *As Neil will discuss, our Quantum Fiber results are bearing this out as we saw another quarter of net adds for our fiber and higher-speed offerings continuing results from previous quarters*.

The jury isn't out on this one. When we invest in consumer fiber, we take share and we drive profitable growth. As I mentioned, upon closing the Apollo transaction, approximately 70% of our remaining mass market footprint will be the sort of urban and suburban markets that are best addressable with Quantum Fiber solutions. *We are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment*.

148.     Then, in response to questions from analysts, Defendants Storey and Dev continued:

**Analyst**

And just maybe one more on the fiber expansion in consumer fiber. You have 2.4 million fiber-enabled homes today. I know you've said in the past, you still think you're underpenetrated. I mean how meaningful do you think that business can become? I mean where are you seeing opportunities where returns or penetration levels you can get are attractive. Maybe you could just expand a little bit on where you plan to take that business in the next few years.

**Defendant Storey**

41

Sure. And we'll give you more information in coming quarters about the plans there. But we've looked at this business. We've been doing our microtargeting that Neel mentioned, and we've been growing our penetration pretty successfully. And so we believe there's a lot of opportunity. If you look at the retained 16 states, that's something like a little more than 20 million homes passed, and 70% of those we consider an urban or suburban market.

So that's 15 million homes, something like that. We think all those are great opportunities for us to invest fiber into. And so we want to ramp our plans and put some scale behind them because we think that they are – based on our experience over the last couple of years, we've done a very good job at continuing to invest fiber and grow where we invest.

\*\*\*

**Analyst**

And when does the Quantum acceleration start? Is that kind of early next year? Or could that happen this year?

**Defendant Dev**

Yes. That's what I was going to add, Simon. I think the underrun that Jeff highlighted is really related to the current environment and the enterprise business, and that's what we manage on a success-based basis. But we haven't slowed down on Quantum, and we are looking to accelerate that second half of this year and going into next year. And that's not contingent on the deal. But with these things, it takes a while because there is this actual physical deployment, so permitting, et cetera, but we're scaling up.

149.    During the August 10, 2021 Cowen Communications Infrastructure Summit, Defendant Moreau misleadingly told investors that Lumen is "actively accelerating our fiber build and have been for some time and plan to continue to do so because we've seen from our efforts over the past couple of years, where we invest, we've grown." She also again repeated, "We are not capital constrained."

150.    During a presentation by the Company's Chief Marketing Officer on September 13, 2021, Defendant Andrews reassured investors that recent changes at the Company are "congruent with our focus and aligned with our focus on really investing where we can grow and focusing on the Quantum Fiber experience in Mass Market and then the growth aspects of Enterprise."

151.   During that same presentation, Defendant Andrews detailed the Company's plans for Quantum Fiber to "win back market share" in the small and medium business marketplace:

> So first and foremost, **having a fiber experience wrapped with security with 2-way speeds that are differentiated and superior to the cable experience is one way that we can drive growth in the mid-market**. Second is partnering with best-in-breed unified communications providers.  So we have a strong relationship with Zoom and Cisco and Teams. And our ability to bring that high-speed 2-way fiber connectivity, rapid security tied with a Zoom experience, tied with the Team experience, tied with Cisco and bring the SIP Trunking, all in one experience for that mid-market customer in a way that they can consume digitally, that's differentiated.

152.   Defendant Andrews went on to confirm that the Company will equally target the consumer mass market:

> And early on when we were looking at the Mass Markets opportunity, **we were clear.  We're going to invest where we can grow, and we're going to invest where we can grow with fiber**, and Maxine has done a fantastic job with that. Now we have Quantum Fiber in the marketplace, where not only do you get a fiber experience, but it's all digital and seamless and quick.

153.   Defendant Andrews also confirmed that the Company was "extremely focused" on growing Quantum Fiber, and that part of the Company's prior divestitures were made to focus the Company on areas that are "really ripe for further investment and growth":

> **That further investing in growth opportunities** is not only along the lives of edge compute and connected security and unified communications, **but it's also within Quantum Fiber and Mass Market.  So there is an opportunity for us to grow there**.

> We do have our line -- our eyes set on where that is.  **And we are extremely focused, and part of the transaction with Apollo was really to cleave off the part where we** weren't going to invest and grow and leave us with the part that's really ripe for further investment and growth.

154.   Then, on September 22, 2021, at the Goldman Sachs Communacopia Conference, Defendant Storey reiterated the Company's current financial commitment to Quantum Fiber in response to a question from Goldman Sachs analyst Brett Feldman:

> I mentioned that we've been ramping Quantum Fiber builds and more details are probably forthcoming in earnings calls and other things. But we're very

pleased with the success that we've seen. We have 2.5 million homes within our fiber footprint. Our penetration rates are going up, our ARPU is strong, customer satisfaction and NPS scores. We've build a digital interaction model over the last couple of years for our Quantum Fiber customers that we think is second to none. And we will continue to – as we build more fiber into locations, we'll bring that suite of capabilities to our customers more broadly.

155.    During an earnings call on November 3, 2021, Defendant Storey repeated his earlier assurances that the Company was continuing its accelerated investment in Quantum Fiber and projected a major ramp up in 2022, explaining:

"I'm excited to discuss the investments we're making to drive Enterprise and Quantum Fiber growth."

\*\*\*

"Let me start with Quantum Fiber. First of all, the quantum acceleration plan has already begun . . . . As we transition from micro-targeting to a broader market approach for deployment, we have high confidence in our ability to drive significant revenue growth for years to come."

\*\*\*

As I mentioned during the second quarter call, we plan to accelerate Quantum Fiber investments in our retained markets. As of the end of the third quarter, we had approximately 2.5 million enabled locations within the retained 16 states. Historically, we've enabled around 400,000 locations per year, and we expect that pace will continue in the fourth quarter. As we accelerate our investment in Quantum Fiber, in 2022, we expect to ramp that enablement pace to over 1 million new locations, on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022. When deploying Quantum Fiber, we typically expect penetration rates of 40% or better with average build cost of less than $1,000 per location enabled.

After a thorough review of our footprint and given these economics, we expect our total addressable opportunity to be more than 12 million locations. Our Quantum Fiber plan for 2022 is fully funded, and we're very excited about these investments. But it's not just excitement born from hope. It's excitement born from experience and accomplishment. As we built Quantum Fiber, we've done more than simply construct new fiber. We built an excellent quantum experience and product capability that is now ready to ramp aggressively, providing higher ARPU, lower churn and greater customer lifetime value.
156.

157.    Later in that same call, in response to an analyst's question about the "consumer fiber investment opportunity," Defendant Storey explained, "we have very high confidence in

our ability to hit those numbers and grow the business aggressively."

158.    Defendant Dev reiterated the commitment to "scaling up our fiber investment" in response to an analyst question about concerns for Lumen's consumer business and reassured the market that "we see that as a significant opportunity. I think the economics are fairly well understood. And so you're going to see us ramping that business, and it's a long-life asset with predictable returns."

159.    On December 7, 2021, at the UBS Global TMT Conference, Defendant Andrews explicitly reiterated Defendants' Quantum Fiber growth and investment claims from the Q3 2021 conference call:

> Focus is definitely on investing for growth, investing for growth, investing for growth. And that comes in the form of investing in the Lumen platform, edge computing, unified communications, wrapping it with cybersecurity, managed services, and then the Quantum Fiber build that Jeff mentioned in our last earnings call, and doubling down there. That's where most of the investment and the focus is in those two conversations.

160.    On January 6, 2022, at the Citi AppsEconomy Conference, Defendant Storey reiterated Defendants' commitment to their prior Quantum Fiber building and investment plan, explaining and reaffirming multiple times within the call that "[w]e've already announced our accelerated Quantum Fiber build and plan to add more than 12 million locations over the coming years in the remaining 16 states that we operate in, in those states."

161.    Defendant Storey gave no indication at all that there were issues with the rollout, explaining, "We have about 2.5 million, using rough numbers, today. So that's about 10 million more locations. We said that, in general, we target less than $1,000 per home. So you can do the math on that. It's a fairly significant investment over the next 4 to 5 years, but we're really pleased with the progress that we've made over the past couple of years and think that there's – it's a great opportunity for us. If you look, that's a significant ramping from where we've been."

162.    Defendant Storey explicitly cited Defendants' past success in the buildout for

why there would be continued investment: "And so we've proven that can build successfully. We've proven that we can deliver successfully and build all of the systems around the customer necessary to do that. So we'll continue to invest there."

163.    Even more specifically, Defendant Storey denied that there had been any change in strategy in confirming the acceleration of the Quantum Fiber buildout, in response to a question from a securities analyst:

> I don't think there's any change, actually. This is the path we've been on, but we need to do the prep work to get ready for it. We needed to have the all-digital experience. We needed to continue to enhance our capabilities. And we wanted to prove to ourselves through micro-targeting that we had all of those capabilities to understand what they are, develop them.
>
> And so it's not – there's no change in the strategy. There's an acceleration of the strategy because we think we have all those things in place. Our NPS scores show it. Our penetration rates show it. We think we have all of the capabilities in place.
>
> Now we just really want to ramp more aggressively. We said that we were – we've historically been at about 400,000 locations pass added every year. We've said that we will do about 1 million locations in 2022, and we'll finish the year at a run rate of about 1.5 million to 2 million locations passed in '23 and beyond. And so it's really the continuation of the strategy we've had. But now we have all the pieces in place to make that acceleration.

164.    Defendant Storey explicitly recognized the aggressiveness of these growth claims, noting "I just said, we're going to ramp from about 5x what our historical number is. So that's pretty quick. We're going to do that over the course of the next year. So I think we are being aggressive." Later in the call, Defendant Storey continued, "That's part of our Quantum Fiber strategy is to focus on dense urban clusters *and make sure that we continue to expand it*."

165.    The above-referenced statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the officers and directors of the Company or recklessly disregarded by them. Specifically, the officers and directors of

the Company made false and/or misleading statements and/or failed to disclose that: (i) various headwinds were impeding the Company's ability to invest in and grow its Quantum Fiber brand; (ii) Quantum Fiber was not progressing as was represented to the investing public; (iii) Lumen's management was reassessing its strategic priorities and had placed a hold on the plans to quickly scale up the Quantum Fiber brand; and (iv) as a result of Lumen's decision to delay expansion of Quantum Fiber, the Company's results and metrics were negatively impacted and the scaling up of Quantum Fiber would not occur until, at the earliest, the end of 2023.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE, BUT THE FALSE AND MISLEADING STATEMENTS CONTINUE

166.    The Individual Defendants' wrongdoing began to unravel on February 9, 2022, when certain of the Individual Defendants finally revealed for the first time the negative effects of stressed supply chains on Quantum Fiber, stating *inter alia*, that these supply chain issues were "a constraining factor on how to accelerate faster."

167.    On February 9, 2022, during a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and full year ended December 31, 2021 (the "Q4 2021 Conf. Call"), Defendant Storey, revealed the negative effects of stressed supply chains on the Company's operations:

> Both enterprise and mass market supply chains are stressed, and we continue working very closely with our diverse and valued suppliers to mitigate risk as we execute on our growth objectives. In addition, we're managing through this inflationary environment and, with some exceptions, do not expect pricing pressures to impede our goals.

168.    During that same conference call, Defendant Storey confirmed that those supply chain obstacles negatively impacted operations regarding Quantum Fiber in response to analyst questioning:

**Simon William Flannery**

*Morgan Stanley*

So good to hear on the Quantum Fiber revenue growth and the build plans. I guess on the build plans, should we think about the -- I think you did 400,000 this year.

Should we think about the 1 million this year as being fairly linear? Or is it still very much second half loaded, I guess, to get to that 1.5 million to 2 million? ***And I guess the question is why not go faster***? We've obviously seen the infrastructure bill award a lot of funding. We've seen fixed wireless gain some traction here. So if you see the opportunity here, you've got obviously a lot of homes with potential.

***So what's keeping you from accelerating that pace***? And then, Neel, just one on taxes. I saw you highlighting, I think, $100 million of cash taxes. But what should we be thinking about run rate cash taxes once the transactions are complete in terms of the ongoing -- as a sort of a full taxpayer? Does that go up a few hundred million as we get out of '22 and to '23?

**Jeffrey K. Storey**

*CEO*

***So Simon, on the build plan for Quantum Fiber, it's not going to be linear. It takes a while to ramp these capabilities, to do the engineering, to make sure that we've got the construction resources in place. So it's not going to be linear*** but it's not going to be fully back-end loaded either. We're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously.  ***So it's a little back-end loaded*** but not substantially.

What keeps us from going faster? This is hard work. It's hard work. There's a lot of things to do. We want to make sure that we do it right. We're exceptionally good at building networks and we will continue to do that with the Quantum Fiber build, ***but there's hard work. And we also have supply chain challenges.*** And I mentioned that in the prepared remarks.  ***I don't want to overemphasize it but it's an issue, and we see it with equipment vendors and chips and them getting access to chips.  So we'll continue to manage that, but that's also a constraining factor on how to accelerate faster.*** Now the main point is we want to accelerate to a point of 1.5 million to 2 million homes by the end of the year. So we want to be on that run rate finishing the year and going into 2023. And that's really a large effort to make sure that we do go as fast as we possibly can.

169.    On this news, Lumen's stock price dropped $1.99, ***or more than 15.5%***, from a

close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022.

170.    Although it was indicated on the February 9, 2022 earnings call and the March

8, 2022 Morgan Stanley 2022 Technology, Media & Telecom Conference that the buildout of Quantum Fiber was not proceeding according to the pace that certain of the Individual Defendants had previously represented during the Relevant Period due to supply chain and labor issues, they continued to conceal the status of the Quantum Fiber launch by issuing false and misleading statements to investors about Quantum Fiber.

171.     Specifically, the Individual Defendants did this by downplaying the significance of the buildout slowdown even during the February 9, 2022 earnings call. For example, Defendant Storey claimed that the supply chain issues would not interfere with Lumen's goal of enabling 1 million homes and businesses with fiber by the end of 2022, stating, "[w]e're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously."

172.     Moreover, Defendant Storey promised that "[o]ur fully-funded 2022 Quantum Fiber plan will enable millions of customer locations to experience our best-in-breed Quantum experience and product capability that we believe will drive higher ARPU, lower churn and significant customer lifetime value. We will invest heavily to bring the Quantum experience to our customers, especially in the areas of product development, marketing, brand and go-to-market sales initiatives." Defendant Storey reiterated that one effect of Lumen's commitment to the "Quantum Fiber deployment plan" is that it would take longer to "reach our target net leverage ratio of 2.75 to 3.25x adjusted EBITDA . . . ."

173.     In response to an analyst question about capital expenditures during the February 9, 2022 earnings call, Defendant Dev reiterated that the Quantum Fiber build was not capital constrained and specified that "to the extent we can scale faster, if you look at the combination of free cash flow and deal proceeds, we can easily ramp up more spending for Quantum Fiber. That won't be the constraint."

49

174.   Defendant Dev also distinguished the 2022 investment in Quantum Fiber from other capital expenditures, that most other investments are "success-based at a much lower intensity," and that "Quantum will ramp up. We do view that as a discrete project, but the rest of the plan will be dynamic and will be success-based."

175.   Defendant Storey echoed this commitment stating, "as we look at the CapEx, we are very committed to investing in Quantum Fiber." He further explained, in response to an analyst question about the future of Lumen's capital investment:

> So what Quantum Fiber investments are we going to make in 2022 that could come off in 2023, we're not giving guidance for 2023, but we do plan to ramp our Quantum Fiber investments. We've said that. We said that our plan for the year in 2022 is 1 million homes, and then we plan to do 1.5 million to 2 million at a run rate basis by the end of the year. So we're not giving forward-looking guidance, but we have given you an indication of what we expect and how we expect to build.

176.   Then, on February 24, 2022, the Company filed its Annual Report on Form 10-K with the SEC for 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Storey, Glenn, Hanks, Dev, Allen, Bejar, Brown, Chilton, Clontz, Jones, Roberts, and Siegel. The 2021 10-K also contained SOX certifications signed by Defendants Storey and Dev.

177.   Pertinently, the 2021 10-K provided that one of the Company's "strategic goal[s]" was to "expand our network capacity through our Quantum Fiber buildout plan and other initiatives."

178.   On March 8, 2022, during the Morgan Stanley 2022 Technology, Media & Telecom Conference, Laurinda Y. Pang, Lumen's President of Global Consumer Success, disclosed that Lumen was facing labor issues and that one of the Company's four top priorities was "around talent. I think in today's market, we all are very keenly focused in on making sure that we've got the right talent within the organization. It's becoming increasingly more difficult for – I think, for any industry, given the world that we live in today."

179.   Later in the call, Laurinda Y. Pang was asked about the labor issues and

explained how difficult times were in that area:

**Analyst**

And I guess that's – you mentioned talent. I guess that that's one of the challenges is finding the people to build these networks.

**Laurinda Y. Pang**

Yes. It's definitely a challenge, right? There's a lot of people out there that are vying for the same talent. And so again, it's something that we have to actively manage ourselves. It's not like the good old days where it happened and that there was a surplus. It's something that has to be managed very carefully.

180.    Additionally, Laurinda Y. Pang disclosed that supply chain issues were still plaguing the Company, stating that the supply chain is "not getting better any time soon" and that "[s]upply chain will affect us in a lot of different areas, whether it be the infrastructure, just upgrades in the network, customer equipment, Quantum Fiber."

181.    On this news, Lumen's stock price declined 3%, from a close of $10.95 per share on March 8, 2022, to a close of $10.62 on March 9, 2022.

182.    However, on March 14, 2022, Defendant Moreau stated:

**Host**

Okay. You mentioned supply chain impacts on your fourth quarter earnings call like a lot of companies. Can you just talk about that, maybe provide an update? [. . .]

**Defendant Moreau**

Sure. So we have seen supply chain challenges in equipment and labor. But we feel like we have a really good ecosystem that we've built over many years. We're a large company. So we have multiple suppliers for our equipment, for our fiber, for our labor, and we feel like that we have many avenues to mitigate any near-term supply chain challenges, but we watch it every day.

We're in close contact with all of our suppliers. They understand what our investment plan looks like. They understand where we're building and the pace in which we plan to build. And so we feel like we're mitigating those not only with our suppliers but also internally as we stay aligned on what our strategic plan is.

***

So as we pivot from this micro-targeting to this market-based approach, you're going to see us ramp. We communicated late last year that that our expectation is that we're going to go from a pace of about 400,000 addressees a year to 1 million this year and exiting the year at anywhere between 1.5 million to 2 million capability exiting the year.

183.     Shortly after Lumen began revealing the truth, on March 28, 2022, the Company announced the abrupt departure of one of the Company's highest-ranking executives, Defendant Dev, after an 18-year tenure at the Company. Described by one analyst as "not anticipated", Defendant Dev's departure was set to be effective just one week later, on April 4, 2022.

184.     Shortly thereafter, Defendant Gibson, Lumen's Senior Vice President of Sales and Marketing, presented at a New Street Research and BCG Fiber to the Future – Global Infrastructure Conference on March 29, 2022, and again misled the market by downplaying the supply chain issues facing the Company in response to questions posed by the host:

**Defendant Gibson**

. . . And then lastly, late last year, we announced that we are going to be investing for growth in mass markets.

We believe that we can pass 12 million or more locations with fiber over the next several years in the remaining 16 state footprint that I mentioned, which has a total of 21 million locations. So if you think of what's left after the 20 states are divested, it's about 21 million locations planned to build fiber to 12 million or more. And as a result of that, we really also announced that we're going to accelerate the pace of our investment.

So the last couple of years, we've reported about a 400,000 living unit per year pace. We announced that we're planning to ramp that up to 1 million locations this year and then in the year with a run rate of 1.5 million to 2 million locations. So we're -- increase our pace in 2022, further increase our pace again in 2023.

So as part of this, we're really transitioning from really a micro-targeted approach to a market-based approach. And what that means is we're going to be targeting larger dense areas in a more ubiquitous way than just targeting certain areas within the market. The work we're doing with Quantum Fiber is really going to play an important role for the overall goal that we announced to return to revenue growth in the next 2 to 3 years.

**Host**

These are obviously very impressive targets. So can you talk a little bit more about -- like you're shifting from doing 400,000 locations annually towards 2 million living units as you publicly talked about it. How do you -- what do you have to put in place to hit some of those milestone because there are obviously a whole set of issues from supply, resourcing, policy, permitting and internal capabilities. Can you talk a little bit more about like how you're thinking about it?

**Defendant Gibson**

Sure. First, I'll probably start with the fact that we really started planning this build well in advance of our announcement, and we feel really good about where we are in the cycle currently. So if you -- and if you think about what I said earlier, the transition from micro targeting to a market-based approach, that really is the key enabler, allowing us to focus on these clusters of living units instead of cherry picking and micro targeting different areas within a market.

***

**Host**

And related to the subsidies, but even in conjunction of your overall fiber deployment, supply chain and labor, we hear those 2 words a lot nowadays. And you obviously, like any other telcos, use outside labor for fiber construction, for splicing, et cetera. Are you facing any labor constraints so far? Are you anticipating? And how are you going about working on it?

**Defendant Gibson**

Yes. I mean we're not immune to supply chain challenges for sure. What I said earlier, though, is we started planning for these builds in the middle of last year. So we didn't really start -- we just thought about the planning once we announced that we were already kind of in the middle of the planning.

From a labor standpoint, we have diversity, we also have internal resources that we believe that we can redeploy to help project management, engineering and as well as other activities within the business. From an equipment and supply standpoint, we placed those orders well in advance, 9 to 12 months in advance to make sure that we get in the queue early. And we have a diverse supplier set that's on the labor side and the supplier side. So we feel really good about where we are.

We're not really seeing anything today, but it's something that you definitely have to say [sic] constantly engaged in and make sure you have mitigation plans in place that we do. So again, I feel good about the -- our ability to execute on the plans that we've laid out. But I'm sure it won't be without challenges and bits along the way.

185.    On April 8, 2022, Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz,

Glenn, Hanks, Jones, Roberts, and Sigel caused the Company to file its 2022 Proxy Statement with the SEC which solicited shareholders to, *inter alia*, (i) elect Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Sigel, and Storey to the Board; and (ii) approve, on a non-binding advisory basis, the executive compensation.

186.    From the outset, in a letter to shareholders written by Defendant Storey, the 2022 Proxy Statement contained the following information, in relevant part:

> We are confident in our ability to grow revenue in the coming years as we are seeing early traction with edge compute and our Quantum Fiber build plan. Quantum Fiber enablements are expected to ramp in 2022 from our 400,000 location historical run rate to as many as 1.5 to 2 million locations exiting the year. The broadband penetration rate of our Quantum Fiber-enabled locations is already more than double that of our copper-enabled locations. 2022 is an investment year for Lumen. We expect to improve our product portfolio and go-to-market initiatives as we drive towards revenue growth. At the same time, we will continue investing to transform our delivery model to optimize both customer experience and operational efficiency.

187.    In discussing the Company's "business highlights," the 2022 Proxy Statements provided:

> During 2021, we made progress advancing our core business strategy to integrate and upgrade our global network and other assets and technologies into an advanced high-bandwidth, low latency platform that is secure, reliable and fast. To that end, we focused our efforts on strengthening our digital self-service product ordering platforms, expanding our offering of secure edge computing services, creating a more adaptive network, and expanding our network capacity through our Quantum Fiber buildout plan and other initiatives.

188.    Based upon the false and misleading statements contained in the 2022 Proxy Statement, shareholders voted in favor of *inter alia*, (i) the election Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Sigel, and Storey to the Board; and (ii) the executive compensation.

189.    During the prepared remarks of the Q1 2022 earnings call on May 4, 2022, Defendant Storey continued to reiterate that "our Quantum Fiber build plan is ramping, and we expect momentum to continue to accelerate as we drive toward our expectation of hitting 1 million or so new fiber enablements in 2022. . . . As we see it, we are in the first inning of this

exciting expansion and are laying the foundation for what we believe is a very large growth opportunity."

190.    More specifically, Defendant Storey explained "[w]e expect the Quantum capital investment to be concentrated over the next several years, but we believe the capabilities we are enabling will sustain our Quantum product for years into the future." Defendant Storey claimed that "having accelerated our engineering and preconstruction work processes in the first quarter, we expect our build pace to continue to accelerate throughout the year, putting us on track to achieving our goal of 1 million or so enablements in 2022" and that "we are pleased with our accelerating build pace and look forward to taking meaningful market share as we continue to gain scale."

191.    In response to an analyst question about supply chain issues, Defendant Storey again de-emphasized them:

> Now the last point is we have great relationships. And so I talked to our major vendors pretty regularly, and we work with them in good times and in bad to make sure that they have accurate forecasts for our services. And so during COVID, I worked with a lot of these vendors to make sure they knew what they could expect from us. And now we're working with them to make sure that we can expect from them. So we'll continue to work through the supply chain issues. It's a warning flag that I want you to hear, but I don't want you to overemphasize it in that either

192.    Then, during the May 19, 2022 Moffettnathanson Media & Communications Summit, Defendant Dugan reiterated the other Defendants' claims that "we're increasing our investments in our mass market space. We've historically built fiber to the home for about 400,000 units per year. We're increasing that this year to 1 million units. But we're planning to really end the year on an accelerated pace for more than 1 million units, 1.5 million or more."

193.    When questioned about their confidence in the Quantum Fiber rollout numbers, Defendant Dugan explained:

> I'd say confidence is high to get to the 1 million units this year. But 1 thing you should recognize is that it's going to be a ramp to that . . . . So your expectations for the first half of the year, don't be too surprised if the volumes don't look like

the run rate that we're trying to get to for next year because work – the work is working its way through that pipeline. Things that we're watching up for is certainly supply. It hasn't gotten in the way of meeting our needs this year. It's something that we're managing very actively and something that we think we can get through.

194.    More specifically, Dugan claimed that "we're managing our suppliers there effectively" and that Lumen had confidence in its fiber suppliers to "get what we need as long as we forecast and order at the right intervals and we are doing that."

195.    Further statements about Lumen's prior planning for the Quantum Fiber rollout were reiterated by Defendant Stansbury at the June 1, 2022 Cowen Technology, Media & Telecom Conference call, where he stated that Lumen had already ordered the supplies needed for the buildout, and that "a dramatic ramp" of builds would occur in the second half of the year:

> If you think about what has to happen to take Fiber to the Home, you've got to do your market identification, you got to do site walks, engineering, permitting, and so all of that activity to fill the 2022 build funnel really started in early fourth quarter last year. And so the work to get 2022 [field] has been complete. We're waiting for permitting now. We're not waiting to order equipment.
>
> So any of the supplies we need to build out those markets has been ordered. And as soon as we get permit approvals, then we're going to be in market. So that's why Q1, and frankly, even Q2, you're not going to see huge numbers, but you will see a dramatic ramp in Q3 and Q4. And importantly, as we exit this year, we will have the funnel full for next year.

196.    Defendant Stansbury continued to brush off concerns by an analyst about the supply chain and whether that would be an issue for the Quantum Fiber rollout:

**<u>Defendant Stansbury</u>**

Yes, we are getting what we need to build those markets. We're a big buyer of those supplies. So we have long memories. And our suppliers do a good job of getting us what we need, so that we can build those markets out. So I don't think that's a constraint. You know a lot of the labor that we use is internal labor, and we're . . .

**<u>Analyst</u>**

And unionized.

**Defendant Stansbury**

Yes. And so we're able to retrain that labor, which is important to that population. It's important to us. And that's allowed us as well to help get these markets build [sic] out, going forward.

197.    On June 13, 2022, at the Wells Fargo Streaming & Connectivity Conference call, the first question Defendant Moreau was asked began with the observation by an analyst that "obviously, today, we'll focus a lot on your Quantum Fiber build. So maybe you could start by talking about the pace of the build this year." Defendant Moreau responded that "we feel really good about our ability to enable 1 million or so locations this year and exit the year at that faster rate [1.5 million or upwards of 2 million thereafter] that you mentioned." During the same call, she later confirmed that "we have line of sight into reach that 1.5 million to 2 million run rate existing this year."

198.    Defendant Moreau was then asked about how she had previously spoken about the "average build cost expected to be less than $1,000 per enabled home," and she confirmed "we feel really good about our assumptions to be able to build in these dense urban clusters averaging around $1,000 per location."

199.    On August 3, 2022, the Company filed its Quarterly Report for the second quarter of 2022 on Form 10-Q with the SEC (the "2Q22 10-Q"), which contained SOX certifications signed by Defendants Storey and Stansbury. The 2Q22 10-Q stated that "[o]ur capital expenditures continue to be focused on enhancing network operating efficiencies, supporting new service developments, and expanding our fiber network, including our Quantum Fiber buildout plan."

200.    That same day, the Company held an earnings call. During the prepared remarks, Defendant Storey assured investors that the Company was still on track for 1 million enablements by the end of 2022 and predicted further growth in 2023:

Our Quantum Fiber build is ramping with second quarter enablements more than doubling since the fourth quarter of last year, and we expect further

acceleration in the second half of 2022 and into 2023. Permitting processes for our Quantum Fiber builds haven't improved as much as we would like, and we see supply chain challenges across our business. But we have not changed our target of 1 million or so enablements by year-end.

201.    Further, Defendant Storey explained, "We are excited to update you on our progress with Quantum Fiber, which is the critical growth engine for this segment. As I mentioned earlier, in just 2 quarters, we have doubled our pace of new Quantum enablements with further acceleration coming. Our Net Promoter Score remains above 50, demonstrating the quality of our product and the easy-to-use nature of our all-digital experience."

202.    In response to a question from an analyst concerned about whether Lumen could meet its fiber passing targets, Defendant Storey again affirmed Lumen's targets of 1 million passings by the end of 2022:

> On supply chain, Eric, you asked if is it equipment, labor or materials. The answer is yes on all 3 of them. We deal with each of them differently. But the inflationary pressures that you see, that the rest of the market sees are the same ones that we see, and they come in those 3 main areas. We've got great -- not the inflation – I'm sorry, the supply chain pressures.
>
> We've got great relationships with our large vendors. So whether that's material vendors or equipment vendors, we've got great relationships with them. We're working through their challenges with them, and we feel pretty good about that. And we think it's improving slightly. But it's too early to call whether that's a blip or a trend. And we'll continue to stay very focused on that, working closely with our large suppliers and our large vendors. And we will continue to work on labor costs.
>
> ***
>
> With respect -- does it slow the Quantum Fiber build? I have not changed my expectations that I've given our team, okay? I still want to get to close to 1 million homes this year. It certainly does affect us. We've talked about permitting. I mentioned it in the comments. Their labor shortages in permitting departments causes problems for us. Labor challenges in electric companies cause problems with us for pole attachments. And so there are other people's labor challenges that do cause us to slow. But I have not changed my targets that I've given our team internally at this point.

203.    Then, on September 13, 2022, Lumen announced the additional departure of the Company's President and CEO, Defendant Storey, effective January 1, 2023. Defendant

Storey's departure came after serving only five years in the Company's top role and hard on the heels of Defendant Dev's exit.

204.    On November 2, 2022, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine months ended September 30, 2022, Defendant Storey revealed delays in the Quantum Fiber build:

> I'd like to talk more specifically about our digital transformation and the foundation we laid for our business going forward. ***Digital transformation is not a destination, but it's a journey***. I'm very pleased with the significant strides we've made in driving simplicity and automation into our business. We are now easier to do business with, have greater efficiency and are evolving the way our customers interact with and experience our capabilities.
>
> Our customer experience is better than ever and continues to improve as demonstrated by our very high NPS and customer e scores for both Quantum Fiber and the upper end of our enterprise customer base. ***Although not yet where we want to be***, our results with our mid-market customers clearly show ***we're making progress*** there as well.
>
> As I say to our team all the time, ***we have much more to do***, and I'm incredibly proud of their accomplishments so far. Top line growth is our principal focus, but ***we cannot overstate the importance of these transformation efforts in delivering the experience our customers want and driving the efficiencies we need to grow the profitability of our business***.

205.    Furthering the admission that the Company's Quantum Fiber was "not yet where we want to be" and that the Company has "much more to do," Defendant Storey continued:

> We have a powerful and robust fiber network complemented with an increasingly deep set of adjacent capabilities like orchestration, interacting with our customers' businesses via machine-to-machine applications rather than phone calls or e-mails.
>
> ***The market for these capabilities is still in the early stages of growth*** that I believe the ***foundation to Lumen to be a market leader has been laid and the opportunity for growth is significant***.
>
> On the Mass Markets side, we have ramped our investment in the Quantum Fiber footprint and our all-digital service delivery platform. We've doubled the number of new enablements per quarter over last year. ***So let me be clear, we are not yet at the pace of build we expect or want***. We will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen.

206.    During that same conference call, Defendant Stansbury also admitted that "we slowed some of our [digital] transformation efforts" while undertaking a series of divestiture transactions.

207.    During the question-and-answer segment of the earnings call, a J.P. Morgan analyst asked "what's holding this [fiber build] back" and "[w]hat's your potential to accelerate from here?" Defendant Storey replied to the analyst:

> If you look at our fiber enablement, ***we're not doing it as fast as we want to do***. So let me lead with that. ***We're not doing it as fast as we want to be deploying new enablement***. There are a lot of things that go into that supply chain constraints, labor shortages, inflationary pressures and those types of things. And we'll continue to work through those. So I'm not terribly worried about it, but we'll work through them.

208.    On this news, Lumen's stock price dropped $1.25, ***or more than 17.7%***, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

209.    Although the November 2, 2022 announcement revealed that Lumen's fiber build had slowed down, the statements made on that date gave investors the false and misleading impression that the Company was continuing to invest in fiber builds, while failing to disclose that Lumen had actually stopped doing so that quarter.

210.    For example, during the conference call, Defendant Storey explained, "We have strong conviction with focusing on growing markets where we can create dense urban clusters, and supporting all of the communities within those clusters is the best approach to maximize our investments and significantly expand the reach of our Quantum Fiber offering."

211.    Similarly, in response to a question about the fiber capital expenditure and its effect on Lumen's goal to pass 22 million homes, Defendant Stansbury again denied that Defendants' goals had changed or revealed that Lumen had stopped the Quantum Fiber rollout:

> I don't think this changes the goal. This is obviously a multiyear project, doing everything and, as Jeff mentioned earlier, to go as fast as we can. Obviously, there's some near-term headwinds. But at this point, I don't think that changes our goal in terms of where we want to go or what we think we can do. it's [sic] really about all hands on deck right now to see what we can do given permitting

and labor issues to get as many enablements in the ground as we can, as fast as we can.

212.     Also, on November 3, 2022, the Company filed its Quarterly Report for the third quarter of 2022 on Form 10-Q with the SEC, containing SOX certifications signed by Defendants Storey and Stansbury (the "3Q22 10-Q"). The 3Q22 10-Q also reiterated the Company's focus of its capital expenditures on Quantum Fiber, as contained in the 2Q22 10-Q, *supra*.

213.     Accordingly, on the December 1, 2022 Wells Fargo TMT Summit conference call, CFO and Defendant Stansbury reiterated that the Company was continuing to invest in fiber builds, stating:

> There was extensive conversation with the Board leading up to the close of that deal. Kate was involved in that before she joined, so that she knew what was coming and had input to that decision. And really, what it all boiled down to is we've got a commitment on Quantum Fiber, and that opportunity is real. We've got an enterprise business that in large enterprise and public sector is performing well, but that also requires capital. And really, over the next 4 to 5 years, we're in investment mode while we position the company for long-term strength and returning capital to shareholders.

214.     Later on that same call, Defendant Stansbury expressed his focus on having Quantum Fiber grow now and emphasized the work that the Company was purportedly doing to grow that business in the present:

> If you think about the consumer business for a second, when you think about Quantum Fiber, the whole mindset about, hey, cannibalization is bad, is exactly why we have roughly 10% copper penetration in the markets where we are and why we're out doing Quantum today. That mindset cannot influence the way we think about the enterprise segment.

215.     In response to a specific question about the previously touted Quantum Fiber goals, Defendant Stansbury misleadingly gave the impression that the rollout was still progressing:

**<u>Analyst</u>**

So I definitely wanted to talk about Quantum Fiber, fiber to the home has been a big topic of discussion at this conference. So you've called out a variety of

labor, supply chain, permitting challenges as part of your Quantum Fiber build. And I know aspirationally in the past, you've talked about wanting to get to a run rate of building out 1.5 million to 2 million locations on an annual basis, so maybe you could talk about the pathway or anything on the timing to get there? And whether you see some light at the end of the tunnel on working through some of these supply chain challenges?

**Defendant Stansbury**

Yes. So when I came in to Lumen, my biggest concern is that we -- I didn't want us just to be focused on number of enablements and cost per enablement, right? We need to be focused on good enablements, right? Enablements that allow us to generate solid penetration as we go forward. So there's no point in building fiber if a customer doesn't want that fiber, right? And so we have gone through extensive work to make sure that those are the kinds of enablements we're building. So that's a real thing. I think there's been very good thinking that's been done on that.

And then yes, that is -- you layer on top of that some of the issues we've had on the supply chain side, and that's where we are today. So I'm not ready to give a time frame on when we get to necessarily those larger numbers. I do think that the scaling of the factory, if you will, is moving in the right direction, but it's not going to be quick. It's -- when you look out in terms of engineering and permitting. At any point in time when you're having that discussion, you're really talking about something that's going to take place in 9 months. And so I think we're doing the right things, but I think it's going to be a little while until we see that really start to ramp.

216.     As Defendant Stansbury further explained, again giving the misimpression that the Quantum Fiber rollout was still continuing: "I also would say that even with our focus on making sure we're building the right enablements, these are growing markets. And they're definitely –we're in Western markets, there's definitely a shift west. I think that will continue to create future opportunity that we can't really measure today. But as building continues and population shift, that's in our favor."

217.     Then, at the December 6, 2022 UBS Global TMT Conference, CFO and Defendant Stansbury claimed that Defendants had paused the Quantum Fiber buildout, but had restarted and was on a better trajectory, all while claiming he was offering "full transparency":

So there's full transparency. There's the external factors with tough labor markets and permitting, but there's also some internal stuff as well. And when I came in, I wanted to make sure that the investments that we were making were in the right markets. We obviously, when we go into a market, we want to cover

it well. But we want to make sure that long term, we're going to earn a return on that. And so we hit pause to double down.

I wanted to make sure there was financial rigor around that. And as a result, we did make some adjustments in terms of what to do and what not to do. And so that slowed us somewhat. I would say the good news is, is I think it put us on a better path as we go forward. The bad news is it slowed us down.

218.    Defendant Stansbury reaffirmed these points later on the same call when he

stated:

I would say that the planning – again, we had a bit of a shift because I hit pause for a few months, but we now know exactly where we're going, what we're doing and how we're going to go about that. So we'll give more color as we go forward. But I think there's no more debate as to what are the right areas to focus on. It's now ongoing and executing.

219.    Defendant Stansbury again characterized Lumen as having previously paused

the Quantum Fiber rollout later in the same call:

And so right now, the #1 focus is growth. Let's make sure we're investing in smart areas and doing the right thing, like the hitting pause on Quantum to make sure that we were building the right markets. But then from there, we go. So the real focus today is making sure that we understand where the gaps are, where we need to invest and then building that into our guidance for the next year. So that's what we're working on.

220.    Furthermore, when specifically asked by Batya Levi, Executive Director and

Research Analyst, at UBS Investment Bank, about "the cost to connect" and whether "$1,000"

was "in the ballpark," Defendant Stansbury responded, "That's in the ballpark. Yes" before

noting, "[a]nd again, there's this huge variation to that, we're depending on whether it's off of

a pole or it's subterranean."

**THE TRUTH IS FULLY REVEALED**

221.    On February 7, 2023, CEO Kate Johnson would finally admit that Lumen had

actually pressed "more of a stop button than a pause button" on the Company's investment in

the Quantum Fiber network and expansion into the small business and consumer markets while

it reevaluated its strategic priorities in the fourth quarter of 2022 – the last quarter that

Defendant Storey presided over Lumen. Indeed, Lumen had managed to enable only 605,000

units with fiber in 2022, well under the 1 million they repeatedly claimed they would complete. CEO Johnson also announced that day that Lumen had revised its enablement forecast to "8 million to 10 million" locations, which was down significantly from prior forecasts of approximately 14-23 million locations, and the 12 million plus locations they touted following the LATAM and Apollo divestitures in mid-2021.

222.   On February 7, 2023, during a conference call to discuss the Company's financial and operating results for the fiscal quarter and full year ended December 31, 2022 ("Q4 2022 Conf. Call"), Kate Johnson stated:

> *Second, let's talk about our Quantum pacing. As we've said previously, we hit the pause button during the fourth quarter. Now to be frank, it was more of a stop button than a pause button, which impacted our Quantum metrics for the quarter.* That said, the evaluation we undertook was absolutely critical to position Quantum for long-term success. By focusing on all metrics and not just the location enablement goal, we've established a higher IRR, more predictable long-term outcome for this exciting project.
>
> A natural outcome of our assessment of Quantum is a more focused build target where we're able to achieve proper returns for shareholders. We believe the overall Quantum enablement opportunity is 8 million to 10 million locations. *The engine is revving back up, and we're aggressively working to ramp our build activities in 2023.* And to that end, we made an important change during the fourth quarter to separate our operational activities like planning, engineering and all field operations between mass markets and business. Maxine Moreau, our President of Mass Markets, now has top to bottom operational and P&L responsibilities. *This is a significant change internally that I expect will improve our Quantum deployment pacing, but it will take time to reach scale.* My expectation is that later this year, you'll see significant improvement in our execution on enablement.

223.   During that same call, Defendant Stansbury further explained the delays in Quantum Fiber expansion:

> As Kate discussed, *we have made significant changes in how we are approaching the Quantum Fiber opportunity*. This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value. That said, *our location and subscriber results were impacted by the pause we had in place through our evaluation. This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year*. During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1

million as of December 31. During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000.

224.     On this news, the Company's stock price dropped $1.04, *or more than 20.8%*, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

225.     As a result of the Individual Defendants' wrongful acts and omissions, as alleged herein, the Company has suffered significant losses and damages.

### POST-RELEVANT PERIOD STATEMENTS CONFIRM THAT THE ABOVE-REFERENCED STATEMENTS WERE FALSE AND MISLEADING

226.     After the Relevant Period, on a March 7, 2023 Raymond James Institutional Investors Conference call, Defendant Stansbury admitted that prior cost estimates per enablement location had not been realistic and that Lumen employees were not being rational:

> But I think there was also a little bit of a gold-rush mentality as it relates to fiber to the home. And I think that emotional exuberance has been at least tempered somewhat with some more rational thought. And I think people are pulling back on their build plans, more realistic cost estimates and ARPUs coming with that as well.

***

> When I came to Lumen [in April 2022], the operations team only had 2 metrics, get to 12 million enabled locations at $1,000 per enablement. Well, that's troublesome as a CFO and so you want to make sure that you're building to the right markets and maybe $1,000 isn't the right number. We're now at $1,200.

227.     In another post-Relevant Period call on June 5, 2023, Defendant Moreau confirmed that the average cost of enablement was higher than the Individual Defendants claimed during the Relevant Period. During the June investor day call, CEO Johnson confirmed that the cost per home "looks like it's inching a little higher" and confirmed that it was in the "range of the 1,000 to 1,500 per location."

228.     Additionally, Lumen's "planning yield" – a key internal metric measured weekly that was relied on by the Company during the Relevant Period to determine where to build fiber, but which metric was not specifically disclosed to investors during the Relevant Period – showed that during the Relevant Period Lumen was not using its capital efficiently to

expand fiber, and it was not anywhere close to being able to meet the new accelerated pace of buildouts. After the end of the Relevant Period at the March 6, 2023 Morgan Stanley Technology, Media & Telecom Conference, Defendant Stansbury explained what the "planning yield" metric is used for:

> So planning yield is the markets you want to build go on the top of the funnel. That then goes through things like site walks and engineering. They built a detailed engineering plan. The engineers come back with a cost that goes to finance. Finance has to make a decision on whether we're going to build or not, and that's what comes out the bottom of the funnel.

229.   In other words, the Company expends money and resources to determine whether it can actually build in a certain location, and then only builds there if finance approves it. The percentage of proposed builds that result in approvals from finance is the "planning yield."

230.   On March 7, 2023, after the Relevant Period, Defendant Stansbury admitted that Lumen's planning yield was below 20% – *i.e.*, finance approved a proposed build only 20% of the time in 2021. At the March 7, 2023 Raymond James Institutional Investors Conference, Defendant Stansbury's described this as "horrendous," and meant that Lumen was wasting "over 80% of [its] resources" on proposed builds that were not approved.

231.   On May 2, 2023, during the Company's earnings call, CEO Johnson confirmed that Lumen's planning yield in 2022 was "as low as 10%[,]" a yield lower than what was previously reported and further illustrated problems with the roll out of Quantum Fiber. CEO Johnson also acknowledged on February 7, 2023, that the penetration rate for the 2021 vintage (*i.e.*, the percentage of units that were fiber-enabled in 2021 that subscribed to Quantum Fiber), was 17%. As Defendant Stansbury would explain a month later on a March 7, 2023 conference call, this number was "not good enough in terms of the ramp that we expected[,]" and was one of the "layers" that caused the Company to stop investing in Quantum Fiber in the previous quarter.

## DAMAGES TO THE COMPANY

232.    As a direct and proximate result of the Individual Defendants' conduct, the Company has and will continue to lose and expend many millions of dollars.

**Securities Class Action**

233.    On August 7, 2023, an amended complaint was filed in the United States District Court for the Western District of Louisiana alleging violations of federal securities laws against the Company and Defendants Storey, Dev, Stansbury, Moreau, Andrews, Dugan, and Gibson in the case captioned *In re Lumen Technologies, Inc. Securities Litigation*, Case 3:23-cv-00286 (W.D. Louisiana) ("Securities Class Action").

234.    On October 13, 2023, defendants in the Securities Class Action filed a motion to dismiss the amended complaint for failure to state a claim. On December 15, 2023, plaintiffs filed their opposition to the motion to dismiss, and on February 1, 2024, defendants filed their reply. At the time of filing this derivative complaint, the motion to dismiss in the Securities Class Action remains pending.

235.    To date, the Company has had to expend significantly on defending itself and the above-named defendants against the Securities Class Action, including through dispositive motion practice, and will continue to expend significantly on its defense and any verdict or settlement that may result.

**Individual Defendants' Compensation**

236.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in excess of $87.8 million in connection with their respective roles as officers and/or directors of the Company, as follows, insofar as can be obtained:

| Defendant | TOTAL COMPENSATION ($) | | | |
|---|---|---|---|---|
|  | **2021** | **2022** | **2023** | **TOTAL** |
| Storey | 22,654,781 | 19,816,806 | - | 42,471,587 |
| Dev | 6,935,121 | 6,524,928 | - | 13,460,049 |

| | | | |
|---|---|---|---|
| Stansbury | - | 10,161,435 | 4,996,780 | 15,158,215 |
| Andrews | 3,032,486 | 2,699,054 | - | 5,731,540 |
| Allen | 326,536 | 345,560 | 335,672 | 1,007,768 |
| Bejar | 363,536 | 380,560 | 348,672 | 1,092,768 |
| Brown | 351,661 | 343,560 | 333,672 | 1,028,893 |
| Chilton | 362,911 | 358,560 | 348,672 | 1,070,143 |
| Clontz | 333,513 | 344,541 | 333,672 | 1,011,726 |
| Glenn | 519,286 | 548,560 | 518,672 | 1,586,518 |
| Jones | 346,536 | 343,560 | 346,797 | 1,036,893 |
| Siegel | 354,971 | 381,060 | 351,172 | 1,087,203 |
| Roberts | 332,536 | 343,560 | 333,672 | 1,009,768 |
| Boulet | 49,750 | - | - | 49,750 |
| Hanks | 459,247 | 466,573 | 88,131 | 1,013,951 |
| **TOTAL** | 36,422,871 | 43,058,317 | 8,335,584 | **87,816,772** |

237.    The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and act in the best interests of the Company, act honestly and ethically and in compliance with all laws and regulations, maintain adequate internal controls, and ensure full and accurate disclosures in public filings and statements. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive and/or committee roles, as detailed *supra*, for which they were compensated for.

238.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and unjust.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

### **Share Repurchases**

239.    As reported in the Company's Annual Reports and Quarterly Reports filed on Forms 10-K and 10-Q with the SEC, the Company engaged in share repurchases throughout the Relevant Period as follows:

| Period | Units Repurchased | Average Share Price ($) | Aggregate Repurchase ($)[3] |
|---|---|---|---|
| August 2021 | 34,520,166 | 12.15 | 419,420,017 |
| September 2021 | 39,285,699 | 12.47 | 489,892,667 |
| October 2021 | 7,108,845 | 12.76 | 90,708,862 |
| November 2022 | 28,413,768 | 6.16 | 175,028,811 |
| December 2022 | 4,559,200 | 5.48 | 24,984,416 |
| **TOTAL** | 113,887,678 | - | 1,200,034,773 |

240.    However, the Company's share price was only worth $3.95 per share – as it was when the truth was fully revealed on February 8, 2023. Therefore, the cumulative 113,887,678 shares should have only cost the Company $449,856,328.

241.    Thus, the Individual Defendants caused the Company to overpay for its own stock by approximately ***$750,178,445***, thereby causing substantial harm to the Company.

**Additional Damage to the Company**

242.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

243.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

244.    As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and misconduct as alleged herein.

---

[3]      Taken by multiplying the number of units repurchased by the average share price, as reported in the Company's SEC filings during the Relevant Period and rounded to the nearest whole number.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

245.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

246.    Plaintiff is a current stockholder of Lumen and has owned Lumen stock at all relevant times hereto. Plaintiff understands his obligation to hold Lumen stock throughout the pendency of this action and is prepared to do so.

247.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

248.    Following the alleged misconduct and damage, On May 11, 2023, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants (defined below) – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as Exhibit A, respectively, is a true and correct copy of the Demand.

249.    On May 26, 2023 and again on June 20, 2023, Plaintiff sent a follow-up email requesting an update on the demand. Attached hereto as Exhibit B is a true and correct copy of counsel for the Board's response.

250.    On July 31, 2023, Plaintiff received a response from the Defendants acknowledging the demand letter and plan to present the letter to the Board at its next regularly scheduled meeting.

251.    On September 5, 2023 and on September 11, 2023, Plaintiff sent a follow-up email requesting an update.

252.     Following this, on September 11, 2023, counsel for the Board responded to inform Plaintiff that the "Board has delegated the matter to its Audit Committee" and that a "further update" is expected "in the next few weeks." The committee members were named to be Defendants Hal S. Jones, Quincy L. Allen, Peter C. Brown, Kevin P. Chilton, and Jim Fowler. Attached hereto as Exhibit C is a true and correct copy of counsel for the Board's response.

253.     Then, on December 20, 2023, counsel for the Board informed Plaintiff that the Board of Directors had appointed a committee to "inquire into the allegations set forth in [the Demand] of May 11, 2023." Attached hereto as Exhibit D is a true and correct copy of counsel for the Board's response.

254.     On December 21, 2023, Plaintiff's counsel requested the names of the people on the purported "committee" appointed by the Board, and sent a follow-up letter requesting the same on March 13, 2024 and again on April 12, 2024. Attached hereto as Exhibit E is a true and correct copy of Plaintiff's follow-up requests.

255.     However, to date, no further update has been received by the Board or its Audit Committee and no report of the results of the investigation of the "committee" has been forthcoming, thus constituting an unreasonable refusal of the Demand. An indefinite deferral will irreparably prejudice the Company and its claims. The wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as a result.

256.     In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy.  Accordingly, these actions cannot be reasonably interpreted as being in the best interests of the Company.

257.     As such, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate a civil action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain

uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in Lumen's favor.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duty)

258.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

259.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

260.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

261.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

262.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

263.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and

reputational harm.

**COUNT II**

**(Against the Individual Defendants for Waste of Corporate Assets)**

264.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

265.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.   It resulted in continuous, connected, and ongoing harm to the Company.

266.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed at ¶ 102, *supra*; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

267.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

**COUNT III**

**(Against the Individual Defendants for Unjust Enrichment)**

268.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

269.    As a result of their wrongful conduct, violations of law, and false and misleading statements, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

270.    The Individual Defendants, by virtue of their positions as directors and officers of the Company, received financial compensation, stock awards, and other benefits, as detailed

*supra*, which was unjust in light of the Individual Defendant's bad faith conduct and is thus against equity and good conscience to permit the Individual Defendants to retain.

271.    Plaintiff, as a shareholder and representative of Lumen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, insider trading, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (Against the Individual Defendants for Gross Mismanagement)

272.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

273.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lumen in a manner consistent with the operations of a publicly-held corporation.

274.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Lumen has sustained and will continue to sustain significant damages.

275.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### (Against the Director Defendants for Aiding and Abetting)

276.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.    The Director Defendants exploited, aided and abetted, and were knowing and

culpable participants to the breaches of fiduciary duty by the Officer Defendants.

278.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

279.    As a result, the Director Defendants substantially assisted the Officer Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

280.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

281.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## <u>COUNT VI</u>

**(Against Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones,
<u>Roberts, Boulet, and Sigel for Violations of Section 14(a) of the Exchange Act)</u>**

282.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.    Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Boulet, and Siegel (the "Proxy Defendants") solicited the 2020 and 2021 Proxy Statements (together, the "Proxy Statements") containing materially false and misleading statements and/or omissions.

284.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

285.   Under the direction and watch of the Proxy Defendants, the Proxy Statements, among other things, failed to disclose that: (i) various headwinds were impeding the Company's ability to invest in and grow its Quantum Fiber brand; (ii) Quantum Fiber was not progressing as was represented to the investing public; (iii) Lumen's management was reassessing its strategic priorities and had placed a hold on the plans to quickly scale up the Quantum Fiber brand; and (iv) as a result of Lumen's decision to delay expansion of Quantum Fiber, the Company's results and metrics were negatively impacted and the scaling up of Quantum Fiber would not occur until, at the earliest, the end of 2023.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

286.   The Proxy Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's business, financial, and operational prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Proxy Defendants to wrongfully benefit from the unlawful and fraudulent conduct alleged herein.

287.   Moreover, the Proxy Statements were false and misleading when they discussed the Company's "strong corporate governance" and adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper practices and issue false and misleading statements and/or omissions of material fact.

288.    In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors and approval of executive compensation.

289.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2023 Proxy Statement who would not have approved, *inter alia*: (i) the election of Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, and Siegel to the Board; and (ii) the compensation of the Company's executive officers.

290.    As a result of the Proxy Defendants causing the Proxy Statements to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the election of Defendants Storey, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, and Siegel to the Board; and (ii) the compensation of the Company's executive officers.

291.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the Proxy Statements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company, waste of corporate assets, unjust enrichment, gross mismanagement, and violations of Section 14(a) of the Exchange Act;

(C)     Finding the Director Defendants for Aiding and Abetting the Director Defendants' unlawful conduct;

(D)     Directing the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(E)     Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 5, 2024                          Respectfully submitted,

**MATTHEW E. LUNDY**
LUNDY LLP
501 Broad Street
Lake Charles, LA 70601
Telephone: (337) 439-0707
Facsimile: (337) 439-1029
Email: mlundy@lundyllp.com


**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*